## Appeal of CLEARFIELD LUMBER CO.

Docket No. 16.    Submitted May 4, 1925.    Decided April 19, 1926.

1. The taxpayer, prior to March 1, 1913, acquired timberlands at a cost of approximately $3.50 per thousand feet of timber. From the evidence submitted, *held*, that the fair market value of said standing timber on March 1, 1913, was not more than $5.35 per thousand.

2. The taxpayer issued $360,000 preferred stock for timber and timberlands in 1907, and $480,000 common stock for cash or its equivalent at or about the same time. Thereafter, from 1909 to 1918, inclusive, the taxpayer retired all the preferred stock and $280,000 par value of common stock for cash. *Held*, that such retirement of preferred and common stock, for the purpose of computing invested capital, is properly to be deducted from capital stock as originally issued and may not be deducted from surplus.

3. In computing inventory of logs and lumber the taxpayer used a unit value representing original cost, which was increased by the Commissioner to the unit value as of March 1, 1913, that is, from $3.50 to $5.35. *Held*, that this increase was justifiable and proper, for the reason that its effect is to allow depletion at a rate in excess of cost at the time when timber is sold, whereas, if the inventory were taken at cost, depletion would be allowed at the time the timber was cut but not sold.

*Robert H. Winn, Esq.,* and *Frank Lowson, C. P. A.,* for the taxpayer.

*Robert A. Littleton, Esq.,* for the Commissioner.

Before JAMES, LITTLETON, and TRUSSELL.

This is an appeal from the determination of a deficiency in income and profits taxes for the year 1918, in the amount of $42,656.07.

### FINDINGS OF FACT.

The taxpayer is a New Jersey corporation, organized in 1905 for the purpose primarily of acquiring and exploiting timberlands lo-

cated on the Licking River in the State of Kentucky. The Morehead & North Fork Railroad Co. is also a New Jersey corporation, organized in or about the year 1907, primarily for the purpose of constructing and operating a railroad running though the lands of the taxpayer and furnishing transportation for its products. During the taxable year the two companies filed a consolidated return for income and profits-tax purposes and are admitted to have been and to be affiliated.

On June 6, 1907, pursuant to a resolution of the board of directors of the taxpayer, it acquired from A. W. Lee, W. B. Townsend, John W. Wrigley, and Carrie C. McGaughey approximately 33,966 acres in fee or timber rights containing, as then estimated, 141,193,000 feet of merchantable timber, and issued therefor its preferred stock in a total amount of $360,000. Thereafter from time to time it issued common stock for cash or its equivalent, it bought timber or timberlands in relatively unimportant amounts, and proceeded with the exploitation of all the land so acquired, conducting extensive operations thereon from 1907 until 1922, by which time substantially all the timber had been cut or sold.

In accordance with certain exhibits submitted by the taxpayer and received in evidence, the actual realized footage of timber bought or acquired for stock as above set forth, its cost expressed in terms of dollars of cash paid or dollars of stock issued, its cost per thousand feet, and its cost less certain charges on account of overhead which do not represent purchase money paid to sellers, are set forth in the following table, the purchases or footage acquired prior to March 1, 1913, being separated from those after that date:

*Cost of footage bought per M.*

| Year. | Footage bought. | Total cost. | Cost per M. | Cost, less overhead. | Cost per M. |
|---|---|---|---|---|---|
| 1905–6 | 10,869,134 | $23,615.96 | $2.18 | $21,878.82 | $2.03 |
| 1907 | 120,867,153 | 434,991.12 | 3.60 | 432,497.65 | 3.54 |
| 1908 | 363,424 | 2,754.85 | 7.56 | 540.00 | 1.48 |
| 1909 | 1,008,777 | 4,160.73 | 4.16 | 2,135.00 | 2.14 |
| 1910 | 410,779 | 765.00 | 1.87 | 765.00 | 1.87 |
| 1911 | 110,129 | 2,010.00 | 18.10 | 742.50 | 6.77 |
| 1912 | 624,429 | 1,917.37 | 3.07 | 1,917.37 | 3.07 |
| 1913 (Jan.–Feb.) | 2,203 | 9.60 | 4.35 | 9.60 | 4.35 |
| Total, Mar. 1, 1913 | 134,256,028 | 470,224.63 | 3.50 | 460,485.94 | 3.42 |
| 1913 (Mar.–Dec.) | 246,137 | 1,052.62 | 4.26 | 1,052.62 | 4.26 |
| 1914 | 713,633 | 1,719.19 | 2.40 | 1,719.19 | 2.40 |
| 1915 | 203,738 | 812.25 | 4.00 | 812.25 | 4.00 |
| 1916 | 25,880 | 152.71 | 5.90 | 152.71 | 5.90 |
| 1917 | 72,685 | 400.60 | 5.50 | 400.60 | 5.50 |
| 1920 | 551 | 6.41 | 11.65 | 6.41 | 11.65 |
| 1921 | 220 | 2.25 | 10.20 | 2.25 | 10.20 |
| Total | 135,518,872 | 474,370.66 | 3.50 | 464,631.97 | 3.42 |

During the entire period of operation, as shown by the records kept by the taxpayer and the reports made to its stockholders, it cut

in log measure 120,088,016 feet of timber and sold without cutting during the years 1916 to 1919, inclusive, a total of 15,430,856 feet, the total timber recovered as shown by its records being 135,518,872. The cut only by varieties of timber for the entire period, the period from 1907 to December 31, 1912, and for the period from January, 1913, to 1924, is as set forth in the following table, minor errors in the figures making a difference between this table and the above-stated total footage.

*Statement of timber cut; Log-scale measure by varieties for the entire operation 1907–1924 and for the periods 1907–1912 and 1913–1924.*

|  | Entire period. | | Period 1907–1912. | | Period 1913–1924. | |
|---|---|---|---|---|---|---|
|  | Log scale. | Per cent. | Log scale. | Per cent. | Log scale. | Per cent. |
| Oak | 61,643,746 | 51.3 | 35,017,874 | 61.7 | 26,625,872 | 41.8 |
| Poplar | 17,197,726 | 14.4 | 6,162,425 | 10.9 | 11,035,301 | 17.3 |
| Hemlock | 18,055,894 | 15.0 | 6,758,134 | 12.0 | 11,297,760 | 17.8 |
| Chestnut | 5,884,058 | 4.9 | 2,068,007 | 3.7 | 3,816,051 | 6.0 |
| Beech | 5,667,379 | 4.7 | 2,000,253 | 3.6 | 3,667,126 | 5.8 |
| Pine | 3,700,860 | 3.1 | 1,318,751 | 2.3 | 2,382,109 | 3.8 |
| Basswood | 1,923,702 | 1.6 | 593,558 | 1.1 | 1,330,144 | 2.1 |
| Maple | 1,764,341 | 1.5 | 671,518 | 1.2 | 1,092,823 | 1.7 |
| Hickory | 1,689,758 | 1.4 | 943,583 | 1.7 | 746,175 | 1.2 |
| Gum | 1,348,069 | 1.1 | 529,760 | .9 | 818,309 | 1.3 |
| Birch | 613,041 | .5 | 180,791 | .3 | 432,250 | .7 |
| Sycamore | 214,406 | .2 | 90,550 | .2 | 123,856 | .2 |
| Walnut | 169,699 | .1 | 88,439 | .2 | 81,260 | .1 |
| Ash | 134,830 | .1 | 74,571 | .1 | 60,259 | .1 |
| All other | 74,966 | .1 | 48,090 | .1 | 26,876 | .1 |
| Total | 120,082,475 | 100.0 | 56,546,304 | 100.0 | 63,536,171 | 100.0 |

One S. B. Reese, during the year 1912 and the early part of the year 1913, purchased for cash, notes and other deferred payments, or acquired in the settlement of litigation, timberlands and standing timber on the Elk Fork of the Licking River in or around Lenox, some 4 miles from Redwine, the terminus of the Morehead & North Fork Railroad constructed by the taxpayer for the purpose of its operations. The timber so acquired by Reese was across a mountain from the terminus of the taxpayer's railroad, and was not accessible to railroad transportation. The footage of such timber amounted to not more than 42,000,000 feet log scale. As shown by recorded deeds, stated by Reese to represent the true consideration, the cost did not exceed in the aggregate $2 per thousand, and a considerable quantity thereof in small lots was bought for less than $1 per thousand. Reese organized the Roper-Reese Lumber Co., and transferred the timber so purchased and acquired to that company for $294,000 in stock. Other parties transferred other contiguous boundaries of timber for $110,000 in stock, bringing the total footage so transferred to not exceeding 51,140,000 feet. Thereafter, the Roper-Reese Co. undertook the construction of a railroad from Redwine to Lenox for the purpose of exploiting its timber, but failed, and, before the completion of the railroad,

went into bankruptcy in the year 1915. In the schedule of assets of that company in bankruptcy the timber held by the said company was stated at 51,140,000 feet log scale, the taxpayer, among others, considering its purchase. The taxpayer offered $100,000 for the property, considered offering $110,000, and it was finally sold to the W. S. Whiting Co. for $116,300. That company thereupon completed the railroad from Redwine to Lenox and constructed a mill, but was unable to operate the property profitably, and thereafter it in turn became a bankrupt. The ultimate cost of the railroad to the Whiting and the Roper-Reese companies was something in excess of $65,000.

The taxpayer in its returns for the years 1917 and 1918 claimed an allowance for depletion of timber on the basis of $8 per thousand feet. The Commissioner allowed depletion at the rate of $5.35 per thousand feet, both basing such allowance upon their respective valuations of the footage as of March 1, 1913.

The value of taxpayer's timber on March 1, 1913, did not exceed $5.35 per thousand feet.

During 1918, the taxpayer sold a portion of its standing timber, estimated to contain 5,178,000 feet, at a price of $32,500, or $6.25 per thousand, and in connection therewith claimed a value of $8 per thousand feet as of March 1, 1913, thereby claiming a loss from the transaction. The Commissioner valued the timber so sold at $5.35 per thousand feet, and computed therefrom a taxable gain of $4,961.90.

As above set forth, the taxpayer in the year 1907 issued $360,000 of preferred stock for a tract of standing timber. It also, from time to time, issued common stock for cash or its equivalent in a total amount of $480,000.

Beginning October 4, 1909, and continuing through the taxable year in question, the taxpayer purchased and retired preferred and common stock on the dates and in the amounts set forth below:

| Date. | Preferred. | Common. | Date. | Preferred. | Common. |
|---|---|---|---|---|---|
| 1909: | | | 1916—Continued: | | |
| Oct. 4 | $12,000.00 | | June 22 | | $24,844.30 |
| Nov. 9 | 3,000.00 | | Aug. 1 | $25,000.00 | |
| 1912: | | | Aug. 28 | | 30,075.70 |
| July 19 | | $24,000.00 | Aug. 29 | 25,000.00 | |
| Oct. 10 | 24,000.00 | | 1917: | | |
| 1913: | | | Feb. 1 | 25,200.00 | |
| Feb. 10 | 25,000.00 | | Apr. 3 | | 25,000.00 |
| Apr. 10 | | 25,000.00 | June 9 | 25,000.00 | |
| July 10 | 25,000.00 | | July 11 | | 25,000.00 |
| 1914: | | | Aug. 10 | 25,000.00 | |
| Jan. 20 | 25,000.00 | | Sept. 4 | | 25,000.00 |
| Aug. 25 | | 31,000.00 | Sept. 10 | 24,800.00 | |
| 1915: | | | 1918: | | |
| Nov. 13 | | 20,000.00 | Jan. 28 | | 25,000.00 |
| Dec. 28 | 24,600.00 | | Apr. 15 | 25,000.00 | |
| 1916: | | | May 23 | 25,000.00 | |
| Mar 4 | | 25,080.00 | Total | 360,000.00 | 280,000.00 |
| Apr 29 | 21,400.00 | | | | |

All of the above purchases were charged against the capital stock account on the books, so that on January 1, 1919, the books showed no preferred stock outstanding and common stock outstanding in the amount of $200,000.

Dividends were paid by the taxpayer to January 1, 1919, on the dates and in the amounts indicated:

| | | | |
|---|---|---|---|
| 1907 | $10,800.00 | 1916—Continued: | |
| 1908 | 81,600.00 | Aug. 29 | $329.15 |
| 1909 | 44,777.52 | Dec. 9 | 4,500.00 |
| 1910 | 20,700.00 | 1917 Feb. 1 | 218.40 |
| 1911 | 20,700.00 | June 9 | 3,744.00 |
| 1912 | 20,460.00 | Aug. 10 | 250.00 |
| 1913 | 250.00 | Sept. 10 | 372.00 |
| 1913 June 10 | 8,880.00 | Dec. 10 | 1,500.00 |
| July 10 | 125.00 | 1918 Apr. 15 | 520.83 |
| Sept. 20 | 25,860.00 | May 23 | 683.32 |
| Dec. 10 | 8,130.00 | July 3 | 25,000.00 |
| 1914 Jan. 20 | 150.00 | July 30 | 20,000.00 |
| June 10 | 7,380.00 | Aug. 15 | 25,000.00 |
| Dec. 10 | 7,380.00 | Aug. 22 | 20,000.00 |
| 1915 June 10 | 7,380.00 | Sept. 11 | 20,000.00 |
| Dec. 10 | 7,380.00 | Nov. 23 | 20,000.00 |
| Dec. 28 | 73.80 | Dec. 20 | 20,000.00 |
| 1916 Apr. 29 | 502.90 | | |
| July 10 | 6,000.00 | Total | 440,859.42 |
| Aug. 1 | 212.50 | | |

With the exception of the dividend paid in 1907, there were sufficient earnings available out of which to pay all of the above dividends. There were no earnings out of which to pay the dividends of $10,800 paid in 1907.

The total earnings of the taxpayer to the end of the taxable year were in excess of $440,859.42, and were in excess of $640,000, but were less than the total of stock retired and dividends paid.

In the letter addressed to the taxpayer under date of February 5, 1924, wherein the Commissioner indicated the computation of the taxpayer's tax for the taxable year under section 301, he determined the consolidated invested capital as of January 1, 1918, of the taxpayer and the Morehead & North Fork Railroad Co. at $524,764.68, as follows:

| | | |
|---|---|---|
| Capital stock | | $275,000.00 |
| Surplus (Clearfield Lumber Co.) | $545,396.46 | |
| Less deficit (M. & N. F. R. R. Co.) | 295,631.78 | |
| | | 249,764.68 |
| Invested capital at Jan. 1, 1918 | | 524,764.68 |

For the year 1917 the Commissioner determined income and excess-profits tax liability of the taxpayer in the amount of $20,373.87, which amount has been paid. On February 10, 1925, the taxpayer

filed a claim for refund of 1917 taxes in the amount of $14,985.25. This claim has not yet been passed upon by the Commissioner. The Commissioner reduced the consolidated invested capital for the year 1918 on account of 1917 income and profits taxes in the said amount of $20,373.87, prorated from June 15, 1918.

In computing its inventories, the taxpayer used as a basis its cost of timber, and inventories were so figured as of the close of 1916, 1917, and 1918. Profits were returned for taxation upon that basis, cost being in all instances lower than market. The Commissioner, in adjusting the income of the taxpayer for the taxable years 1917 and 1918, computed inventories upon the basis of timber values used by him for the allowance for depletion, that is, upon the basis of $5.35 per thousand, which was in all cases higher than cost.

In the said letter of February 5, 1924, the Commissioner fixed the war-profits credit of the taxpayer for the year 1918 in the amount of $47,397.83. The said amount was computed by adding to 10 per cent of the invested capital, as computed by him, the specific exemption of $3,000.

Subsequent to the mailing of the letter of February 5, 1924, the taxpayer made application to the Commissioner to have its profits-tax liability for the year 1918 determined under the provisions of section 328 of the Revenue Act of 1918. Said application was approved and the profits-tax liability was redetermined accordingly. In that determination of the deficiency from which the taxpayer appeals, the profits-tax liability has been determined in accordance with the provisions of section 328.

OPINION.

JAMES: Summarized, the taxpayer complains of the determinations of the Commissioner giving rise to the deficiency in the instant appeal, as follows:

(1) That he has valued its stumpage at March 1, 1913, for purposes of depletion and computation of gain or loss on sales, at $5.35, whereas the true and correct value as of that date was $8.60.

(2) That the Commissioner made substantially the same errors in the year 1917, thereby computing a greater tax liability for that year than the taxpayer owed, and in consequence, in accordance with his usual method, decreased by too great an amount the taxpayer's invested capital for the year 1918. The taxpayer does not assert this overpayment of 1917 tax as an offset to the 1918 tax, but only as an element affecting invested capital for the taxable year.

(3) That he deducted from capital stock the amounts of such stock purchased and retired, but should have reduced surplus by those amounts. Had the Commissioner followed this procedure,

there would not have been sufficient surplus of the taxpayer from which to deduct the deficit of the Morehead & North Fork Railroad Co. in the amount of $295,631.78, or all of that amount, and the taxpayer claims its invested capital would have been increased by $236,577.80 had the Commissioner deducted such retirements from surplus.

(4) That the inventories of the taxpayer for 1917 and 1918 should not have been increased from cost to the basis per thousand used by the Commissioner in computing depletion, or from approximately $3.50 to $5.35.

Taking up first the assignment of error, which is predicated upon an erroneous computation of 1917 tax, it is sufficient to say that the points involved in respect of invested capital and claimed for 1917 are the same as those involved as to 1918. The decision on the 1918 income and invested capital questions adequately disposes of the questions raised as to the 1917 invested capital which affect 1918.

Taking up the remaining questions presented by the taxpayer in the inverse order of their importance rather than in the order in which they were presented, we will deal first with the method of inventory valuation.

The Commissioner has prescribed that inventories be taken at cost, or at cost or market, whichever is lower, deriving his power for these regulations from section 203 of the Revenue Act of 1918. In article 1583, the Commissioner defines cost in the case of manufactured articles produced by the taxpayer as " *the cost of raw materials* and supplies entering into or consumed in connection with the product, * * *."

Both the Commissioner and representatives of taxpayers have fallen into awkward and confusing terminology in connection with the difference between cost and March 1, 1913, values reflected in depletion allowances, terminology which appears to have added to the confusion in the instant case. It has been the habit to call this differential " realized appreciation," whereas, in fact, it is merely tax-free income. It appears to be the intent of the statute and the regulations not only that taxpayers shall have returned to them free of tax the cost of property acquired, but, also, if acquired before March 1, 1913, that they shall exclude from taxable income, as income is realized from the sale or other disposition of such property, that portion of the profits represented by the difference between cost and value on March 1, 1913. This view has been recognized by the Supreme Court. *Goodrich* v. *Edwards*, 255 U. S. 527. In the case of a sale of property, where the March 1, 1913 value is in excess of cost, the computation of taxable gain as distinguished from actual gain is readily made by subtracting the March 1, 1913, value from the selling price.

In the case of property, however, which is sold, but which, in the interim, passes through inventory, a more complicated situation in fact but not in principle arises. In the case of such property, there is still a basic cost which is to be taken into consideration in determining gain or loss from the ultimate sale, and it is that cost which enters into the ordinary merchandising accounts of the exploiter of natural resources. Cost of goods sold is still made up, in his case, of prime cost of mineral or timber, plus the cost of reduction to merchantable form. The difference between prime cost of $3.50, as in the case of this taxpayer, and $5.35, the value at March 1, 1913, is merely that amount per thousand feet of lumber which the taxpayer is permitted to receive as exempt income. If net income were computed in the first instance by the taxpayer upon the basis of cost of its depletable assets, and the resulting costs of merchandise were built upon such costs, there would appear in the taxpayer's accounts a difference between the gain shown in its profit and loss statement and the taxable gain equivalent to the difference in the depletion rate at cost and at March 1, 1913, multiplied by the units depleted. This difference is the thing which in respect of extractive industries has come to be called " realized appreciation," meaning by that term that the subject matter of depletion has been extracted or severed from the land and sold, and the excess of March 1, 1913, value over cost has been realized by sale. The proceeds of that sale have become part income and part return of original capital cost, the income in turn being severable into its two parts of taxable and tax-free income.

The question then becomes one merely of determining the year in which the taxpayer shall be allowed to make effective the deduction of this differential. Under the method pursued by the Commissioner in this case, whereby the inventory of logs is taken upon the depletion basis, so much of the depletion allowance, computed as such from cutting records, as is represented by logs on hand at the end of the year, is in effect denied as a deduction in that year, and becomes cost of goods sold in subsequent years, thereby allowing the deduction for depletion, not in the year in which timber is cut, but in the year in which timber is sold. The taxpayer is here contending in effect for the allowance of depletion in full in the year in which timber is cut, without reference to the time when it is sold. Under the Commissioner's method, it would appear superficially that a taxpayer with an increased inventory as between the beginning and end of the year would in effect be taxed upon an unrealized income and the taxpayer with a decreased inventory would be allowed an unrealized deduction of the difference between cost and March 1, 1913, value. But this is true only in appearance, and

only if the inventory be considered separate and apart from the allowance for depletion.

Neither the statute nor article 1583 of the Regulations specifically provides for the taking of any inventory at March 1, 1913, value. On the contrary, the Regulations clearly provide for the taking of inventories at cost or cost or market, whichever is lower. As a matter of strict interpretation of the Regulations, it would appear that the Commissioner, by using March 1, 1913, values in computing inventories in cases such as this, directly violates his own regulations. But this loses sight of the fact, as stated above, that in the extractive industries capital assets in the form of timber or mineral products are reduced first to merchantable form and then sold. The real purpose to be accomplished is so to adjust the accounting that the depletion allowance shall include a return of the cost of capital assets plus the excess of March 1, 1913, value over cost, and that that depletion allowance should be made available as a deduction only when the timber cut or the mineral extracted is sold. This result is accomplished by the method pursued by the Commissioner in this case. We believe it is a practicable method and a comparatively simple one for accomplishing the end desired and more clearly reflects the income of the taxpayer than would a method in which the depletion allowance would be deducted in the year of cutting or extraction without further adjustment. The Commissioner's method does not impair an ultimate allowance of depletion in full, inclusive of value on March 1, 1913.

The second point in controversy deals with the adjustment of invested capital made necessary by the taxpayer's return to its stockholders of the amounts theretofore invested by them in its capital stock. This point would not be material to the taxpayer were it not for the fact that the Commissioner deducts from the surplus of the Clearfield Co. the deficit of the railroad company, and would not then be material were it not for the fact that the total of ordinary dividends and capital retirements exceeds the additions to surplus of the taxpayer for its entire period of operations. Because this latter is the fact it is apparent that, if all capital retirements are first deducted from surplus, together with all ordinary dividends, there results an impairment of capital originally invested, and it is claimed that therefore the deficit of the railroad company may not be deducted from the remaining capital of the taxpayer.

The Commissioner, both in 1917 and 1918, in the computation of invested capital, pursued what appears to be a wholly inconsistent course. He deducted from invested capital in their entirety all retirements of capital stock up to the beginning of the taxable year in question, but as to capital stock retired during each of those years he deducted only an amount representing the difference be-

tween the amount of the retirement and the earnings to the date of retirement. It is this latter principle which the taxpayer is seeking in effect to apply to the entire item of capital stock retirement.

The question presented is purely legal and has to do with the construction of section 326 of the Revenue Act of 1918 as affected, if at all, by section 201 thereof.

Section 326, in defining invested capital, provides that it shall include cash or property paid in for stock or shares, with certain limitations here not material, and paid-in or earned surplus and undivided profits. It further provides in section 326(d), "the invested capital for any period shall be the average invested capital for such period, * * *." Section 201, in which is defined the term "dividends," bears an important but apparently confused relation to the subject matter here under consideration. The pertinent provisions are as follows:

(a) That the term "dividend" when used in this title * * * means (1) any distribution made by a corporation, * * * to its shareholders or members, whether in cash or in other property * * * out of its earnings or profits accumulated since February 28, 1913, * * *.

(b) Any distribution shall be deemed to have been made from earnings or profits unless all earnings and profits have first been distributed. * * *

(c) * * * Amounts distributed in the liquidation of a corporation shall be treated as payments in exchange for stock or shares, and any gain or profit realized thereby shall be taxed to the distributee as other gains or profits.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(e) Any distribution made during the first sixty days of any taxable year shall be deemed to have been made from earnings or profits accumulated during preceding taxable years; but any distribution made during the remainder of the taxable year shall be deemed to have been made from earnings or profits accumulated between the close of the preceding taxable year and the date of distribution, to the extent of such earnings or profits, * * *.

Interpreting the foregoing provisions of the statute, the Commissioner promulgated article 862 of Regulations 45, which reads in full as follows:

PURCHASE OF STOCK.—Where a corporation either directly or indirectly, as for example through a trustee, has prior to the taxable year bought its own stock, either for the purpose of retirement or of holding it in the treasury or for other purposes, the entire cost of such stock must be deducted from the aggregate invested capital as of the beginning of the taxable year, if such deduction has not already been made. Where such stock is purchased during the taxable year a deduction from the invested capital as of the beginning of the taxable year and effective from the date of such purchase is required only to the extent that such stock has not been purchased out of the undivided profits of the taxable year. See article 857. The full amount derived in cash or its equivalent from the resale of such stock may be included in the invested capital from the date of such resale, unless such stock had been purchased out of earnings of the taxable year. See article 542.

It is apparent from the foregoing that Congress has nowhere directly provided for the situation here involved. It has specified that invested capital includes cash and the value of property paid in for stock or shares, and that invested capital shall be the average invested capital for the year, but it appears nowhere to have specifically considered the possible effect on invested capital of a return in cash or property to the stockholders of a going concern of all or a portion of the capital which they originally paid in. It is not surprising that this should be so, since it could become material to the computation of invested capital only in two unusual situations: (1) in cases in which capital returned was greater than the earnings; and (2) in cases in which, due to a computation of consolidated invested capital, it might become material to inquire whether losses on the one hand might be deductible from profits on the other, and the extent to which such deductions might be made. The taxpayer contends that we are confronted with both these unusual circumstances.

It must be clear that the provisions of section 326 are not to be read literally in the sense that invested capital at all times includes all property values theretofore paid in to a corporation for stock without regard to the later history of that stock. Such a construction would defeat the manifest purpose of the provision, for capital which has been contributed and then withdrawn certainly may not after its withdrawal be said to be "invested." In *LaBelle Iron Works* v. *United States*, 256 U. S. 377, the court, defining invested capital, says (p. 388) :

The word "invested" in itself imports a restrictive qualification. When speaking of the capital of a business corporation or partnership, such as the act deals with, "to invest" imports a laying out of money, or money's worth, either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business, or by the concern itself in acquiring something of permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains.

Where capital has been withdrawn from the corporation, it certainly is no longer a possible source of future gains in that venture. From the standpoint of the stockholder, the capital is no longer at the risk of the enterprise, but has been reconverted to his undisputed control and use. *Appeal of Minneapolis Sash & Door Co.*, 2 B. T. A. 505.

With this construction, we find no conflict in the provisions of section 201. The section itself is headed "Dividends," and certainly liquidations whereby capital stock is purchased and retired can not in ordinary terms be considered to fall within the meaning of that word. The section is to be construed in the light of its title, and not by ignoring it.

It was primarily the intent of Congress, however, to give as broad a meaning as possible to section 201 and some of its provisions, notably subdivision (e), can have no significance except as bearing upon invested capital. Subdivision (c), quoted above, is significant only in so far as it relates to distributions in excess of the amounts paid in to the corporation for stock, and is intended to define or measure the profit realized from transactions of this character. It has only a very indirect significance, if any, in relation to invested capital.

Subdivision (e) is, then, to be read in the light of the general title of the section, and in the light of subdivision (c). We have no doubt that distributions of surplus as such come within the rule, and that a liquidating dividend involving both the retirement of stock and the payment of an excess over the values paid in therefor would be deducted from invested capital if made after 60 days from the beginning of the year only in the amount in excess of current earnings. But in the instant case, we have only a retirement of stock at par where paid in in cash or in property which the Commissioner has treated as having par value at the time paid in.

Section 201 was construed by the District Court for the Western District of Kentucky, in the case of *Langstaff* v. *Lucas*, 9 Fed. (2d) 691.

The court, in the course of its discussion, says:

This section [201(c)] strips distributions made to stockholders in liquidation of a corporation of all disguises and declares that they shall be considered for what they in effect are—purchases of all their outstanding stock by the liquidating corporations, and not dividends as generally understood, and as defined in section 201, subsection (a), and as used in section 216. So construed, subsection (c) of section 201 puts the stockholder who holds his stock up to the time of liquidation, and then in effect sells it to the corporation, upon exactly the same footing as the stockholder who sells his stock to another during the operating life of the corporation.

And further the court says:

As generally understood and used, a dividend is a return upon the stock of its stockholders, paid to them by a going corporation without reducing their stockholdings, leaving them in a position to enjoy future returns upon the same stock. * * * In other words, it is earnings paid to him by the corporation upon his invested capital therein, without wiping out his capital. On the other hand, when a solvent corporation dissolves and liquidates, it distributes to its stockholders, not only any earnings it may have on hand, but it also pays to them their invested capital, namely, the amount which they had paid in for their stock, thus wiping out their interest in the company.

See *Lynch* v. *Turrish*, 247 U. S. 221; *Lynch* v. *Hornby*, 247 U. S. 339.

The rule as above laid down for liquidating corporations applies, we believe, equally to corporations which purchase a portion of their

capital stock at the value at which it was originally paid in. In such cases, the stockholder ceases to be a holder of that stock, and ceases to have any further interest in the portion of the surplus of the corporation theretofore in effect attaching to that stock. The surplus then attaches to the stock still outstanding, to the enhancement of its value, and certainly can not be said to have been used for the purpose of retiring the stock purchased.

We are of the opinion, therefore, that the Commissioner is in error in so far as he has related the deduction from invested capital during the taxable years 1917 and 1918 to the earnings of those years, but correct in so far as he has excluded capital stock purchased and retired in its entirety from the invested capital of the taxpayer from the date of such purchase and retirement.

This brings us to a consideration of the last and principal point raised by the taxpayer in its appeal. The Commissioner has valued at $5.35 per thousand the timber holdings of the taxpayer for purposes of depletion and for the purpose of computing gain or loss on certain minor sales of standing timber. The cost was approximately $3.50 per thousand, and the taxpayer claims a value at March 1, 1913, of $8.60, based upon the opinion testimony of 10 witnesses submitted in depositions. The taxpayer arrives at the figure of $8.60 by adding the values which existed in the opinion of each of its witnesses and dividing those values by 10.

The Commissioner determined the value of $5.35 from statistics gathered by him and compiled by engineers employed in the Bureau. None of this material was placed at the disposal of the Board, but the Commissioner did place on the stand the engineer who made the determination here in question. It became immediately apparent that the witness had only hearsay knowledge of the property of the taxpayer and of all timber property in that area. He had never examined the property of the taxpayer and relied entirely for his valuation upon information as to sales, which was not placed in the record, and upon the facts of the taxpayer's operations as gathered from its books. Little weight is to be attached to this testimony.

We find ourselves, for reasons stated below, even more unable to accept the values claimed to have been proven by the testimony of taxpayer's witnesses.

The witnesses consist of E. Q. and W. T. McGlone, S. M. Bradley, H. M. Collins, Drew Evans, T. B. Staggs, W. G. Blair, G. H. Gearhart, S. B. Reese, and D. B. McKenzie.

E. Q. and W. T. McGlone were brothers operating small stave mills in and around Morehead, Ky., which was the northern terminus of the Morehead & North Fork Railroad Co. In that connection they purchased from time to time relatively small quantities of tim-

ber for manufacturing staves. The timber so purchased consisted principally of oak and was bought because that species was used in their operations. The witnesses had not bought stumpage in general and do not appear from their testimony to have operated on a large scale or to have any accurate idea as to the values of large timber properties. They testified solely upon the basis of their knowledge of values for their own peculiarly selected type of manufacture, the oak timber acquired for their purposes being, next to poplar, the highest valued timber in their vicinity, and they used only the higher grades of that. Their knowledge of the taxpayer's property was limited to viewing it in a general way. How general that view was is shown by the testimony of E. Q. McGlone, who stated on cross-examination that oak timber ran 60 to 65 per cent of all the timber in that vicinity, and poplar constituted another 20 per cent, making a total of at least 80 per cent of these two high-priced species. His viewpoint is well expressed in his statement that " with us the value of the oak represented about 90 per cent of the value of the entire timber in tracts." It is apparent that the testimony of both these witnesses is predicated entirely upon oak timber, and that of high grade. In placing a value on taxpayer's timber of $8.50 per thousand they both were quite plainly thinking in terms of oak and poplar without realizing that the original percentage of oak and poplar to the total timber of the taxpayer was only about 65 and that approximately 57 per cent of the oak timber was cut prior to January 1, 1913, so that on that date the oak and poplar constituted only $59\frac{1}{10}$ per cent of the total timber of the taxpayer as shown by the table set out in our findings of fact.

S. M. Bradley was engaged in the lumber business in and around Morehead and had been a member of the Kentucky State Senate. He testified that the taxpayer's timber had a value of from $8.50 to $9 per thousand on March 1, 1913. His recollection of his own transactions is so indefinite as to deprive his testimony of any substantial value.

The following is a fair sample of his testimony on cross-examination:

Q. Did you buy any timber in 1913?

A. Yes, sir.

Q. Where was that timber located?

A. I always had several tracts of timber, and I have bought tracts close to this Clearfield timber a good many times.

Q. When you bought close to this timber, what tracts did you buy?

A. I would have to refer to my books to tell you.

Q. What quantity did you buy in the vicinity of this Clearfield Lumber Company timber?

A. Well, I bought one tract on a branch that ran into a fork of the Craney, before the Clearfield Lumber Company bought this, and off of this tract, ¶

believe. I did not buy it, but Mr. Wells bought it and I furnished the money and got the lumber, etc., and helped to take it off.

Q. What size or area was it?

A. It was a pretty good boundary; but I do not remember the number of feet.

Q. Do you remember what was paid for it?

A. I could not say; I don't remember now.

Q. About what date was that?

A. Well, sir, I think—though I won't state positively—that it was around 1901 or 1902.

H. M. Collins, an attorney of Frankfort, Ky., had been treasurer and vice president of the Licking Coal & Lumber Co. and vice president and general manager of the North Fork Cannel Coal Co. He testified that the timber of the taxpayer was worth on March 1, 1913, at least $8 per thousand. He was not familiar in detail with the taxpayer's property, either in 1913 or apparently at any other time. Collins is, at that, one of the taxpayer's most satisfactory witnesses.

Drew Evans, like the McGlones, was principally a manufacturer of staves. He testified to the purchase of a tract of timber known as the Van Sant timber, containing about 925,000 feet, for which he said he gave $5,000, and stated that the timber in that tract was the ordinary run of timber, with some of the best oak and the greater part of the poplar cut out. The purchase was made in 1914. He testified that the Clearfield Lumber Co.'s timber was better than the Van Sant and was worth on March 1, 1913, about $8.50 per thousand. He testified to other purchases, but at a materially later date than March 1, 1913, some of them being purchases from the Clearfield Lumber Co. itself. He testified that the Clearfield lumber would run 60 or 70 per cent oak and about 15 per cent poplar, but could not give an estimate over the whole tract of the Clearfield Lumber Co.

T. B. Staggs is a manufacturer of hardwood flooring, has been secretary and general manager of the Salt River Lumber Co. for many years, and testified to a value of the taxpayer's timber of $8.25 per thousand on March 1, 1913. He had not made a detailed cruise of the taxpayer's timber and had gained his knowledge from general observation only of the property.

W. G. Blair is a resident of Clearfield, Ky., and was for eight years judge of the County Court of Morgan County. He had been a farmer, a merchant, and had engaged in the lumber business. He was at one time a director and president of the West Liberty Bank and had been from time to time connected professionally with the Clearfield Lumber Co. He was so employed in 1913. He testified to a value in his judgment of $8 to $10 per thousand for their tim-

ber. His testimony with reference to the character of the timber cut before and after March 1, 1913, is illuminating:

Q. Judge Blair, on the 1st of March, 1913, or about that time, had the Clearfield Lumber Company cut any of its timber?

A. Yes, it had cut quite a good deal of it.

Q. Are you enabled to say how the character of the timber that they had then cut compared with the character of timber that they had left standing?

A. Yes, sir; the timber they had in 1913 was quite a good deal better grade of timber up to that time.

Q. How did that happen to be true?

A. It had not been cut over; they had been working on farm tracts; they had to cut these tracts first on account of the time they had to take it off; and they left the best timber toward the last.

The value of this testimony in the light of the cutting records of the taxpayer is self-evident. In connection with the quantity of timber owned, the witness also stated:

Q. Do you know about what per cent of this timber would be oak?

A. Only to guess at it; I never manufactured much timber myself. I think of the timber that they owned in 1913, the oak would run around 60 per cent; that would be my idea about it.

George H. Gearhart is a stockholder in the taxpayer, a director and general manager. He places a value of $8.04 on the taxpayer's timber as of March 1, 1913. He is a practical lumber operator, and testified in detail as to grading and quality of lumber, oak and poplar being the more valuable grades.

We come now to a consideration of the testimony of S. B. Reese and D. B. McKenzie.

Reese, prior to 1912, was a timber operator on a small scale, is at present living in Lenox, and has lived at Farmers or Lenox, Ky., for 24 years. In 1912 and 1913, he undertook to assemble in one lot for operation a substantial quantity of timber, variously estimated at from 42,000,000 to 62,000,000 feet, this being the timber mentioned in our findings of fact. He testified that he bought that timber in general at about $7 per thousand. It was located near Lenox some six miles from Redwine, at that time entirely off the railroad and separated from the railroad by a mountain, over which the lumber would have to be hauled unless a railroad were built into the property. After assembling the tract in question, Reese turned it in to the Roper-Reese Lumber Co. for $294,000 in stock, others associated with him turning in additional tracts also for stock, and that company undertook to construct an extension of the railroad from Redwine to Lenox. As set forth in our findings of fact, the company became a bankrupt, the property was sold to a successor concern, and that concern in turn failed, although the railroad was ultimately built. The witness on direct examination is very positive

that about 42,000,000 feet was bought for cash and that the price paid was $7 per thousand. On cross-examination, however, he became increasingly indefinite; for instance:

Q. What was the total cost of the whole of this forty-two million feet; that is your lump cost of all of it?

A. I am not able to tell you exactly what it was.

Q. That was in 1912 and 1913, and yet you don't know what you paid for it?

A. Not to the dollar; no, sir.

Q. Within a hundred dollars could you tell us?

A. No, I am not able to tell you.

Q. Could you tell us within a thousand dollars of what you paid for it?

A. I am not able to tell you the price; because I don't know what it was sold for.

Q. You sold it to the Roper-Reese Lumber Company after you got it?

A. Yes, sir.

Q. What was the actual cost price, and what did it bring in 1912 and 1913, from a willing seller to a willing purchaser, for a cash consideration?

A. What is the question?

Q. I want to know how much money you put into it?

A. About $30,000.00.

Q. That was the actual cash?

A. Yes, sir.

Q. That was for the 42,000,000 feet of timber?

A. Yes, sir.

Q. That embraced your notes and cash?

A. Yes, sir.

Q. You turned that over to the Roper-Reese Company—what was the consideration there?

A. Seven dollars per thousand.

Q. How was that paid?

A. That was paid in stock.

\*          \*          \*          \*          \*          \*          \*

Redirect examination:

Q. Mr. Reese, in your cross-examination you testified that for 40,000,000 feet of timber at $7.00, approximately you paid, or arranged to pay, $30,000.00. Was that what you meant to say?

A. No, sir, it was not.

Q. How did you happen to make that statement?

A. I just figured it here in my head. It should have been $294,000.00, instead of $30,000.00.

Cross-examination:

Q. Was that the price you paid for this timber?

A. Yes, sir.

Q. Did you pay for it by check?

A. Part of it by check and part by notes.

Q. Have you those checks?

A. No, sir.

Q. Do you know where they are?

A. No, sir.

Q. At what bank did you keep your money?

A. I kept my money at the West Liberty Bank.

Q. The full $294,000?

A. Yes; and in stock.

Q. You paid cash and notes?

A. Yes, sir.

\*      \*      \*      \*      \*      \*      \*

Q. The deeds you took for this property, did they recite the consideration to be paid?

A. Yes, sir.

\*      \*      \*      \*      \*      \*      \*

Q. What was the capital stock of the Roper-Reese Lumber Company?

A. I believe $500,000.00.

\*      \*      \*      \*      \*      \*      \*

Q. They paid you $7.00 a thousand?

A. Yes, sir.

Q. And that was $294,000.00 worth of stock?

A. Yes, sir.

D. P. McKenzie, who assisted Reese in the purchase of the timber above mentioned, testified to a value of taxpayer's timber at " a dollar or two more on the thousand than that was where we were buying." This the taxpayer contends is the equivalent of a value of $8.50 per thousand. McKenzie testified on cross-examination as to the purchases made by Reese as follows:

Q. You know what he was paying per thousand?

A. He bought some by the tree and some per thousand.

Q. When you bought by the tree, what did you pay?

A. For some we paid $1.50 a tree, some $1.00; and some we bought by the whole boundary.

Q. A tree that you would pay $1.50 for, how many feet would be in that tree?

A. We would figure that it would average around 400 feet.

\*      \*      \*      \*      \*      \*      \*

Q. How many tracts, and how many thousand feet did you pay $7.00 per thousand?

A. I don't remember; I was working by the month.

Q. If he said he paid $7.00 for the 42,000,000 feet, what would the stumpage have cost?

A. He never told me what he paid.

With reference to the relative quantity of the more valuable species, Reese testified that the Clearfield lumber was about 60 per cent oak and 20 per cent poplar, and McKenzie testified that the Clearfield lumber was 60 per cent oak.

At the hearing of the appeal subsequent to the taking of depositions, the Commissioner put in evidence certified copies of all of the deeds covering the purchases by Reese and which were subsequently transferred to the Roper-Reese Lumber Co., together with a transcript of that portion of the bankruptcy proceedings setting forth the timber assets of the bankrupt company. From these two series of documents, taken with the admission by Reese that the deeds stated the considerations paid, it is possible in a number of instances

to determine with fair accuracy the truth of the testimony, extracts from which are set forth above. It appears, for instance, that in the case of 11 tracts trees were bought as stated by McKenzie. The number of trees in these tracts total 7,069, and the total consideration received is $7,901, and in five of these instances a nominal additional annual rental was required. On the basis of 400 feet per tree, the 7,069 trees above mentioned, at the consideration stated, cost $2.80 per thousand.

So much for the expert testimony offered by the taxpayer. We come now to a consideration of the circumstantial facts which lead up to the conclusion that the Commissioner has not undervalued the taxpayer's property for purposes of the allowance for depletion, and for the computations of gain on sales.

In the first place, as set forth in our findings of fact, the major portion of the taxpayer's property was acquired for stock, and it appears from the tables set forth in our findings that the timber acquired as a whole in that year shows a cost of $3.60, largely weighted, of course, by the principal tract. This is out of line with the prices paid for smaller tracts at or about the same time. At the time this timber was acquired the railroad from Morehead to Redwine had not been built, the timber was inaccessible, and in many respects the situation was similar to that surrounding the Reese timber between Redwine and Lenox in 1913. The taxpayer acquired its property in 1907. Six years later we find Reese paying between $1 and $2 per thousand for timber described as substantially like that of the taxpayer, and we find the entire tract which Reese got together, having no railroad transportation to make it as accessible as the taxpayer's property, sold for $116,300. The taxpayer at that time in 1915 declined to pay more than $110,000·for that large tract. Even at a most conservative estimate of 40,000,000 feet in the Reese tract, the taxpayer at that time regarded timber unaccompanied by railroad facilities as being worth less than $3 per thousand. It is shown by the testimony that the purchaser of this property, after completing the railroad at ·a ʺtotal cost of some $65,000 failed. The taxpayer, with ample resources, in a position to extend its own railroad, with an opportunity to buy a substantial tract of timber which that extended railroad would make available, and being manifestly the one operator best able to exploit ʹthe property, declined to pay somewhat less than $3 per thousand for it.

In considering the taxpayer's tract as of March 1, 1913, two facts appear, one unfavorable and the other favorable to the taxpayer. To December 31, 1912, the taxpayer cut 56,546,304 feet of timber, of which 35,017,874 was oak and 6,162,425 feet was poplar, these two species being 72.6 per cent of the entire cut. To the

end of its operations, the taxpayer cut 120,082,475 feet, of which 61,643,746 feet was oak, and 17,197,726 feet was poplar. In other words, up to March 1, 1913, the taxpayer had cut approximately 57 per cent of its oak, the remaining oak was less than 42 per cent of the total timber remaining, and it had cut approximately 35 per cent of its poplar. Taking the two species together prior to January 1, 1913, the percentage of oak and poplar cut was 72.6, and after January 1, 1913, it was 59.1. Basswood, walnut, and ash, described as being equally valuable with these species, were unimportant. There is no testimony as to the relative value of hemlock, chestnut and beech, the three varieties of greatest importance next to oak and poplar on the taxpayer's property, and as to all of which there was relatively more cut after January 1, 1913, than before. In view of the fact that practically all the witnesses for the taxpayer place oak and poplar at approximately 80 per cent of the taxpayer's timber, and testify that these are the most valuable species, it is quite apparent that their estimates are wholly unreliable in the light of the actual facts.

The other fact, favorable to the taxpayer, is the existence on March 1, 1913, of the Morehead & North Fork Railroad, and the influence which it unquestionably had on the value of the taxpayer's timber. Considerable testimony was introduced by the taxpayer as to the cost of transportation of logs or lumber or staves over the mountains, the inference to be gathered being that the taxpayer's timber was worth as much more than timber inaccessible by railroad as was represented by the cost of transportation to the railroad. There is no relationship between the two. The conditions surrounding a small stave operation where the finished product is hauled out are quite different from the conditions surrounding a large lumbering operation which could not possibly be carried on at a profit with the primitive facilities of hauling by teams or logging on mountain streams. The true test of the difference in value between timber on and off the railroad is whether adequate transportation facilities can be carried to the inaccessible timber, the cost of such facilities charged against its exploitation, and the product still placed on the market at a profit. It is doubtful if any of the taxpayer's witnesses, except Gearhart, had the slightest idea of this type of business thinking, and in fact it is evident that Reese's lack of it was the reason for his failure as an operator of a large-size project.

It appears from Reese's testimony that the extension of the railroad from Redwine to Lenox cost in all some $65,000. This seems very low, but, as the timber in Reese's tract was worth less than $3 per thousand, the difference between that value and the value allowed by the Commissioner to the taxpayer here would still represent a

differential in excess of $2.35 per thousand to allow for the cost of railroad facilities, which, on 40,000,000 feet, would be $94,000, and on 50,000,000 feet would be $117,500, or nearly twice the stated cost of the railroad from Redwine to Lenox.   Under all these circumstances, we are convinced that the Commissioner has at least not understated the value of the taxpayer's timber as of March 1, 1913.

We believe that the taxpayer's witnesses were endeavoring for the most part to be truthful.   They were attempting, however, the almost impossible task of placing themselves in 1925 in the mental background of 1913, without accurately refreshing their recollections as to transactions which took place about 1913, with which they were familiar at that time, and which would have furnished them with an informed judgment of values at that time.   A reading of their testimony convinces us that none of the witnesses except Gearhart testified from any but the most general knowledge of conditions over a long period of years, colored necessarily by all the events which have transpired since 1913 to affect their judgment of values as of that date.   It is difficult enough for the skillful expert to separate his judgment into periods when supported by detailed records of sales in the area under consideration.   Here all the circumstantial facts are utterly at variance with the oral testimony.

It follows from the foregoing that the deficiency determined by the Commissioner in this appeal must be approved in all respects.

*The deficiency for the year 1918 is $42,656.07.   Order will be entered accordingly.*

On reference to the Board, TRAMMELL did not participate.