W. M. RITTER LUMBER COMPANY, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 42833–42836, 43604–43606, 48749, 57319–57322.

Promulgated March 31, 1934.

[1] Proceedings of the following petitioners are consolidated herewith: Raleigh Lumber Company; W. M. Ritter Flooring Corporation; Big Sandy and Cumberland Railroad Company; Knox Creek Railway Company; Winding Gulf Railroad Company; Smoky Mountain Railway Company; Red Jacket Consolidated Coal and Coke Company, Inc.; and Red Jacket Jr. Coal Company.

*J. S. Seidman, Esq.*, and *Frank E. Seidman, C.P.A.*, for the petitioners.

*Philip M. Clarke, Esq.*, and *Stanley E. Pearson, Esq.*, for the respondent.

236

238

246

254

OPINION.

LEECH: In presenting the evidence upon which the first issue must be decided the parties have submitted for our consideration a most voluminous record, consisting of the testimony of numerous expert witnesses, maps, publications, schedules, computations, and timber questionnaires. This opinion would be interminable if we endeavored to include in our findings of fact all of the data considered in arriving at the March 1, 1913, values as found for the five blocks of timber, respectively.

A careful study has been made of the maps, data, and testimony showing the relative location and topography of the timber tracts and of the effect of consolidation of numerous tracts into compact boundaries for block operations. Also, the thickness of the stand of timber per acre, the species distribution, the size and quality, the availability of the timber to the mills and of the mills to the consuming markets, the mill run value and cost of production of lumber produced from the blocks, and other factors upon which the expert witnesses founded their opinions, including the fact that all of the blocks, except one (Nantahala), were being profitably logged at the basic date.

We are confronted with the problem of determining the March 1, 1913, value of timber, largely upon opinion testimony, for, while we have before us a great mass of factual evidence as to the nature of the properties on the basic date, we are not timber experts. However, having before us those basic facts upon which the expert witnesses founded their conclusions as to values, we are able to determine the weight to be given to the testimony of some thirteen experts whose opinions do, and probably should, differ. The witnesses' education, training, experience, and peculiar knowledge of the facts are essential requirements.

We need not review the qualifications of each of the numerous witnesses. Suffice it to say that more weight has been given to the opinions of petitioners' witnesses than those of the respondent for

the reason that, collectively, they were more thoroughly acquainted with the basic facts as they existed prior to and at March 1, 1913, and, through their experience with purchases and sales and the actual operation of timber properties, possess higher qualifications in reference to the properties in controversy. Some of respondent's witnesses, although timber men, had never inspected the properties in question, except briefly a few weeks preceding the trial and after millions of feet of timber had been cut off during the intervening years.

Most of the sales to which respondent's witnesses testified have been disregarded entirely because of the lack of details necessary to determine the comparability, if any, to the properties in question. Testimony as to other sales is entitled to little weight, due to the location of the properties and slight comparability as to the species of the trees, the areas, and logging conditions.

While we are of the opinion that the whole range of values to which respondent's witnesses testified is too low, in our judgment the values now sought by petitioners, which are in excess of those we have found, are not sustained by the record. The values we have found are the same as those set out by petitioners in the several timber questionnaires prepared and filed during 1919 and 1920. Petitioners are not bound by those valuations in the sense that they may not now prove different values. Cf. *Spreckels* v. *Brown*, 212 U.S. 208, 210. However, petitioners' principal witnesses in this proceeding fixed those values 13 or 14 years nearer the basic date while acting upon the facts and circumstances known by them to exist or reasonably to be anticipated at March 1, 1913. Valuations are at best a matter of opinion and, after study of the basic facts as to the property itself, the opinions of the experts and weight to be given each, the conflicting mathematical computations of estimated future realization per thousand feet, and other data, it is our judgment that the record substantiates the values we have found. The recomputation of the depletion deduction for each of the years in question will be made under Rule 50 upon the basis of such values and the data as stipulated in petitioners' Exhibits 33 to 36, inclusive, incorporated in the findings by reference.

*Issue No. 2—Invested Capital and Basis for Depletion for Years 1920 to 1928 Western Pocahontas Tract.*

This issue involves the question of whether the timber on the Western Pocahontas tract was purchased or leased in 1909, and the cost basis of such timber which had not been cut on January 1, 1920, for the purpose of computing invested capital for 1920 and depletion for the years 1920 to 1928, as to the Ritter Co.

The question of whether the instrument of December 1909 conveyed title to the timber or a leasehold interest therein involves property rights of the parties thereto in West Virginia and must be determined pursuant to the laws of that state. Cf. *Crooks* v. *Harrelson*, 282 U.S. 55; *Uterhart* v. *United States*, 240 U.S. 598; *Balkan* v. *Woodstock Iron Co.*, 154 U.S. 177; *E. K. Wood Lumber Co.*, 25 B.T.A. 1013, 1023. This question is not affected by the decisions in *Burk-Waggoner Oil Assn.* v. *Hopkins*, 267 U.S. 110, and *Burnet* v. *Harmel*, 287 U.S. 103, holding that state law can not control the interpretation of the Federal revenue acts, because the present issue does not involve the character or taxability of income.

Neither respondent nor petitioners have cited any authorities on this question of law. On brief petitioners' chief contention is that even on the basis of the respondent's determination that the instrument was a lease, the unit cost per thousand feet of timber on the Western Pocahontas tract was $5.30 instead of $6, as used by respondent in determining the cost basis of the 62,986,242 feet standing and available to the Ritter Co. on January 1, 1920.

The instrument designates itself as a lease and the parties thereto as lessor and lessee. The lessor "grants" to the lessee the right to cut, convert into personal property, remove and sell all timber 13 inches and up in diameter and the use of the land for such purpose during a period of 15 years, for a specified rental. The instrument provides for forfeiture by the lessee and a reversion to the lessor. All the essentials of a valid lease are present. The instrument contains no words of sale or conveyance, ordinarily used in a deed to pass fee simple title or a lessor freehold estate in the standing timber. We conclude that the transaction in 1909 was a lease and not a sale. Cf. *Harvey Coal & Coke Co.* v. *Dillon*, 59 W.Va. 605; 53 S.E. 928; *Tootham* v. *Courtney*, 62 W.Va. 167; 58 S.E. 915; *Brown* v. *Gray*, 68 W.Va. 555; 70 S.E. 276; *Wilson* v. *Buffalo Collieries Co.*, 79 W.Va. 279; 91 S.E. 449; *Furrow* v. *Blair*, 84 W.Va. 654; 100 S.E. 506; *Cunningham* v. *Heltzel* (W.Va.), 105 S.E. 155; *Adkins* v. *Huff*, 58 W.Va. 645; 52 S.E. 773.

The lease provided for payments of $6 per thousand feet of timber as cut, but minimum payments of $100,000 per annum for 10 years and not more than a total of $1,000,000 for all of the timber available under the lease. Such timber amounted to 188,650,567 feet and the unit cost thereof was $5.30 per thousand feet. In 1909 the total available timber was divided approximately half and half by agreement between the Ritter Co. and the Raleigh Co.

Petitioner (Ritter Co.) does not contend that the respondent has understated the total cost of all the timber available to it on the Western Pocahontas tract and the record does not disclose any under-

statement. Its contention is that the 62,986,242 feet standing on January 1, 1920, at a unit cost of $5.30 per thousand feet equals a cost of $333,827.08 on that date, which should be included in invested capital for 1920 and also used as the basis for computing depletion on timber cut from that tract during the years 1920 to 1928. The determination of this issue may not be made upon that factor alone and without consideration of the depletion deductions allowed in prior years. Cf. *C. B. Shaffer*, 29 B.T.A. 1315.

Respondent has computed depletion, on the timber alone, at the rate of $6 per thousand feet as cut from March 1, 1913, to December 31, 1919, resulting in an unrecovered capital cost of $293,139.98 for the 62,986,242 feet standing and available to the Ritter Company on January 1, 1920. In establishing the unit cost to be $5.30 instead of $6 per thousand feet for all the timber available under the lease, petitioner has shown merely that respondent has computed and, so far as the record discloses, allowed deductions from gross income for depletion in years prior to 1920, in amounts in excess of actual unit cost of the timber cut. In our judgment such allowances were reasonable and petitioner has had the benefit of the deductions, resulting in a recovery of capital cost except for the remaining $293,-139.98, as determined by respondent. If the remaining unrecovered capital cost on January 1, 1920, should now be increased to $333,-827.08, the petitioner would secure a double deduction on the same asset to the extent of the increase, to which it is not entitled. *Alpin W. Cameron*, 20 B.T.A. 305, affd., 56 Fed. (2d) 1021. The theory underlying the allowance of depletion and/or depreciation is that a gradual sale is being made by use of the asset over a period of time and that at the end of its useful life the aggregate of the sums set aside in the several years should equal the original cost basis. *United States* v. *Ludey*, 274 U.S. 295. In numerous cases we have adjusted the rate applicable to the remaining unrecovered capital cost, cf. *James R. McCahill*, 29 B.T.A. 1080, but we have denied any increase in the remaining capital cost to be recovered where there was no understatement of the basic capital cost or value. Cf. *J. J. White Lumber Co.*, 24 B.T.A. 274.

On this issue respondent's determination is sustained.

### Issue No. 3—Gain or Loss on Sale of Timber.

This issue involves merely a recomputation of gain or loss on the sale of timber in certain years on the bases of a stipulation incorporated in the findings by reference and the March 1, 1913, value of the timber as heretofore determined by us. The proper adjustment will be made under Rule 50.

*Issue Nos. 4 and 5—March 1, 1913, Value of Lands.*

These issues involve the determination of the March 1, 1913, fair market value of certain lands as distinguished or separated from the value of merchantable timber standing thereon. The record contains the opinion testimony of the witnesses who testified with respect to the timber values in issue. The values set out in the findings have been determined after consideration of all the evidence, including that referring to location, accessibility, utility, and the expert testimony pertaining thereto.

The values so found will be used as the basis in recomputing under Rule 50 the gain or loss upon the sales in issue.

*Issue No. 8—Affiliation.*

This issue involves the question of whether the Consolidated Co. and the Jr. Co. were affiliated with the petitioners from May 15, 1923, to November 18, 1926, or during any part of that period.

As to the Consolidated Co., there was issued in the names of Wilson and Cummins on January 1, 1923, 15.1 percent of the outstanding common stock pursuant to an agreement whereby the transferors retained the voting rights of such stock until it should be paid for solely out of the dividends accruing thereon. At that time Wilson and Cummins had no funds and no prospects of acquiring funds sufficient to pay for the stock. On May 15, 1923, the Ritter Co. purchased 83.8 percent of the outstanding common stock and 98.6 percent of the outstanding preferred (voting) stock of the Consolidated Co. from W. M. Ritter and four other large stockholders. Also, on the same date and from the same persons, the Ritter Co. acquired the voting rights of the 15.1 percent common stock issued in the names of Wilson and Cummins, through the assignment to it of the agreement under which such stock was issued to them on January 1, 1923. At the same time the notes of Wilson and Cummins and the stock certificates, endorsed in blank as collateral to the notes, were delivered to the Ritter Co. Having the legal right to vote such 15.1 percent of the stock, the Ritter Co. had " control " thereof within the meaning of section 240 (c) of the Revenue Act of 1921.[2] *Gulf Coast Irrigation Co.*, 24 B.T.A. 958; *J. A. Folger & Co.*, 23 B.T.A. 210. Accordingly, the Ritter Co. owned directly or controlled 98.9 percent of the common stock and 98.6 percent of the voting preferred

[2] For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

stock of the Consolidated Co. during the period May 15 to December 31, 1923, inclusive. We are of the opinion that the Ritter Co. owned or controlled "substantially all" of the stock of the Consolidated Co. within the meaning of section 240 (c) of the Revenue Act of 1921 and that those companies were affiliated during the said period from May 15 to December 31, 1923. Cf. *Brownsville Ice & Storage Co.*, 18 B.T.A. 439.

As to the balance of the period in controversy, January 1, 1924, to November 18, 1926, the Ritter Co. must have owned at least 95 percent of the voting stock of the Consolidated Co. to have been affiliated therewith pursuant to section 240 (c) of the Revenue Acts of 1924 and 1926.[3]

Under the terms of the agreement pursuant to which the 15.1 percent common stock of the Consolidated Co. was issued in the names of Wilson and Cummins and immediately endorsed in blank and redelivered to the transferors, the former were not obligated to pay for the stock other than by a credit of any accruing dividends thereon. It may be seriously doubted if there was an actual sale or transfer of title to the stock to Wilson and Cummins. Cf. *Moore* v. *McGrawl*, 63 Fed. (2d) 593. However, we need not so hold, specifically, in view of the facts existing at the close of the year 1923. At that time it was known that no dividends would be declared and that all the notes would be in default on January 1, 1924. Thereupon, in December 1923 the Ritter Co. and Wilson and Cummins abrogated the stock purchase agreements by mutual oral consent. As between those parties that contract of December 1923 was then completely executed. The Ritter Co. then had and retained possession of the outstanding certificates endorsed in blank by Wilson and Cummins. The fact that through inadvertence such stock was not transferred on the books of the corporation is immaterial. As between the parties, the beneficial interest in the stock was assignable by parol. The ownership passed immediately by force of the agreement evidencing the intent to pass immediate title, which effected delivery of the stock already held by the Ritter Co. and endorsed in blank by Wilson and Cummins. Registration on the books of the corporation is merely for the convenience of the corporation and its stockholders. *Lipscomb* v. *Condon*, 56 W.Va. 416; 49 S.E. 392; *West* v. *Empire Life Ins. Co.*, 242 Fed. 605. Cf. *C. J. Swift Co.*, 12 B.T.A. 974; *Federal Advertising Agency, Inc.*, 19 B.T.A. 1126, 1135; *Gorton Roth*, 26 B.T.A. 631.

---

[3] For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns at least 95 per centum of the voting stock of the other or others, or (2) if at least 95 per centum of the voting stock of two or more corporations is owned by the same interests. * * *

On January 1, 1924, the Ritter Co. owned the 15.1 percent common stock of the Consolidated Co., although through inadvertence it remained standing in the names of Wilson and Cummins until November 18, 1926, on which date the Ritter Co. had the stock issued in its name. Accordingly, from January 1, 1924, to November 18, 1926, inclusive, the Ritter Co. owned 98.9 percent of the common stock and 98.6 percent of the voting preferred stock of the Consolidated Co. and was affiliated therewith pursuant to section 240 (c) of the Revenue Acts of 1924 and 1926.

As to the Jr. Co., 12.6 percent of the common stock stood in the names of Wilson and Cummins under the same circumstances as heretofore stated with respect to the Consolidated Co., and the Ritter Co. owned 81.6 percent from May 15 to December 31, 1923. Thus, the Ritter Co. owned or controlled 94.2 percent of all the outstanding stock of the Jr. Co. during that period. Section 240 (c) of the 1921 Act does not specify a definite minimum percentage, but instead, " substantially all " of the stock, to bring about affiliation. The term is an elastic one and prior to the decision in *Handy & Harmon* v. *Burnet*, 284 U.S. 136, this Board and the courts granted affiliation in many cases involving varying percentages of ownership or control of stock ranging from as low as 69 percent and 72 percent involved in *Ajax Enameling & Foundry Co.*, 7 B.T.A. 1230. Since that case, the construction placed on the term " substantially all " has been much stricter in cases too numerous to need citation. Each case has been decided upon its own facts and no general rule has been established as to what percentage constitutes " substantially all." None of the cases decided subsequent to *Handy & Harmon* v. *Burnet*, *supra*, which we have examined involved an ownership in excess of 85 percent which was held to be insufficient. In *Burnet* v. *Bank of Italy*, 46 Fed. (2d) 629; certiorari denied, 283 U.S. 846, the court held that " substantially all " is an elastic term which does not mean a fixed percentage, but does mean all except a negligible minority and, further, that 15 percent is not a negligible minority. In *Handy & Harmon* v. *Burnet*, *supra*, six men owned 93.71 percent and 75 percent, respectively, of the voting stock of two corporations. In its opinion the Supreme Court apparently accepted 93.71 percent as " substantially all " the stock of one corporation and (inter alia) discussed only the question of the ownership of 75 percent of the stock of the other, which it held not to be " substantially all." The Court did not decide nor intimate what minimum percentage may be considered " substantially all." After consideration of those decisions, we are of the opinion that 5.8 percent is a negligible minority and that the Ritter Co. owned or controlled substantially all of the Jr. Co. stock within the meaning of section 240 (c) of the 1921 Act

and was affiliated therewith from May 15 to December 31, 1923, inclusive.

Under the circumstances heretofore stated with reference to the Consolidated Co., the Ritter Co. also became the owner on January 1, 1924, of the 12.6 percent stock of the Jr. Co. standing in the names of Wilson and Cummins, making a total of 94.2 percent owned on that date. Of the balance of the stock outstanding from January 1, 1924, inclusive, 2.5 percent was owned by persons described by the record as " others " and 3.3 percent was owned by Cummins, he having bought the stock and paid cash therefor in 1911. Although Cummins was employed from year to year and the Ritter Co. had control of his stock by acquiescence and the exigencies of business, that is not sufficient to constitute the stock ownership by the Ritter Co. and Cummins " of the same interests," for Cummins was not a stockholder of the Ritter Co. *Handy & Harmon* v. *Burnet, supra.* Section 240 (c) of the Revenue Acts of 1924 and 1926 requires, for the purpose of affiliation, the ownership of *at least* 95 percent of the voting stock. This is a specific statutory requirement which may not be varied, even though the Ritter Co.'s stock ownership falls short by only .8 of 1 percent. Accordingly, the Ritter Co. and the Jr. Co. were not affiliated during the period January 1, 1924, to July 31, 1924, inclusive.

On August 1, 1924, the Ritter Co. acquired the 2.5 percent of the Jr. Co. stock in the hands of " others ", thus making its total ownership amount to 96.7 percent of all the voting stock of the Jr. Co. Thus, the Ritter Co. and the Jr. Co. were affiliated during the period from August 1, 1924, to November 18, 1926, inclusive.

### *Issue Nos. 9 and 10—Net Loss Application.*

These issues involve the application of net losses of the Consolidated Co. and the Jr. Co. in years prior to affiliation with the Ritter Co. and the other petitioners. The respondent determined that they became affiliated with the Ritter Co. on November 18, 1926, and, further, that they were not affiliated with the Ritter Co. during the period May 15, 1923, to November 18, 1926, but that during that same period they were affiliated with each other. In Issue No. 8 we determined that the Consolidated Co. was affiliated with the Ritter Co. during the period May 15, 1923, to November 18, 1926, and that the Jr. Co. was affiliated with the Ritter Co. from May 15 to December 31, 1923, and from August 1, 1924, to November 18, 1926. The Jr. Co. was not affiliated with either the Ritter Co. or the Consolidated Co. during the period January 1, 1924, to July 31, 1924, inclusive.

The parties have stipulated certain figures and facts as to the years 1921 to 1928 as set out in the findings with reference to these issues, and also, they have included in stipulations (applicable to Issues 15 to 18, and 40, and included in the findings by reference) certain adjustments to income and deductions of the Consolidated Co. and Jr. Co. for the years 1923 to 1928. They have further stipulated additional depletion deductions for both companies for the years 1923 to 1928, based upon the Board's determination of Issue No. 14. Thus the parties, by agreement, have placed themselves in a position to recompute the income or net losses of these two companies under Rule 50. We are asked to determine merely the application of any net losses of the Consolidated Co. and the Jr. Co. prior to affiliation with the Ritter Co. and its other affiliates.

The record does not disclose the exact stock ownership as to the Consolidated Co. and the Jr. Co. prior to May 15, 1923, except that with reference to Issue No. 8, the testimony was that W. M. Ritter and four other individuals were the largest stockholders. No issue has been specifically raised as to the affiliation of those two companies prior to May 15, 1923, and the only reference thereto in the record is the stipulation that, "Respondent did not allow any deductions from the consolidated income of the Consolidated and Jr. Companies for statutory net losses (as provided by section 204 of the Revenue Act of 1921 and section 206 of the Revenue Acts of 1924 and 1926) if any, sustained from January 1, 1921, to November 18, 1926, or any part of said period."

Petitioners contend that the Consolidated Co. and the Jr. Co. were affiliated with each other prior to affiliation with the Ritter Co. and other petitioners, and that their consolidated losses prior to affiliation with the group should be applied against their consolidated income as one unit after affiliation with the group, instead of being treated separately. In the case of the *Delaware & Hudson Co.*, 26 B.T.A. 520; affd., 65 Fed. (2d) 292, the Board said, " The *Woolford and Planters* decisions have now settled that the affiliated group is not a taxpayer, but is only the machinery for determining the factors upon which the tax liability of each separate corporation is computed. Each corporation is a taxpayer in its own behalf. * * * There is no support for the use of a statutory net loss of one corporation except to apply it to that corporation alone, and this is as true in respect of affiliated corporations as of independent corporations." In applying their respective net losses, the Consolidated Co. and the Jr. Co. must be considered separately and independently.

*Woolford Realty Co.* v. *Rose*, 286 U.S. 319, lays down the rule that a net loss sustained by a corporation prior to affiliation may be applied, not to the net income of the group for which a consolidated

return is filed, but only to the same corporation's net income for the succeeding (second) taxable year and the excess to be carried over to the next succeeding (third) taxable year, at which time the process of carrying over is to end, and that a net loss carried forward may be deducted only from net income for the current year, computed without the deduction of such prior year's net loss, that is, a net loss may not be used in computing a net loss. Under the decision in *Swift & Co.* v. *United States*, 38 Fed. (2d) 365, cited with approval in the *Woolford* case, the application of the net loss to the corporation's net income for the succeeding taxable year after affiliation must be limited to the amount not absorbed, as a current loss, by the income of the consolidated group. See *Washburn Wire Co.*, 26 B.T.A. 464; *Delaware & Hudson Co., supra.*

We have held that in applying a statutory net loss under the Revenue Act of 1921 the term " taxable year " as used in section 204 (b)[4] means a taxable period of twelve months and is not changed by affiliation occuring therein. The calendar year 1923 of the Consolidated Co. and the Jr. Co. is divided into two parts, January 1 to May 14, prior to affiliation, and May 15 to December 31, after affiliation, which are not to be taken as separate taxable years, but are to be considered as together constituting one taxable year in computing the separate net income or net loss of each taxpayer. Consequently, in relation to the calendar year 1921, the calendar years 1922 and 1923 are the " succeeding taxable (second) year " and the " next succeeding taxable (third) year," respectively. In respect to the calendar year 1922, the calendar year 1923 is the " succeeding taxable (second) year." The net loss for 1923 must be apportioned between the periods January 1 to May 14, prior to affiliation, and May 15 to December 31, during affiliation. The net loss sustained prior to affiliation may be carried forward to the next two succeeding taxable years and applied solely against the income of the corporation sustaining the net loss. The net loss sustained after affiliation should be either absorbed by the income of the consolidated group for 1923 or carried forward and applied solely against the income of the corporation sustaining the loss, but must not be applied twice. Cf. *General Box Corp.*, 22 B.T.A. 725; *Riley Stoker Corp.*, 26 B.T.A. 749; affd., 67 Fed. (2d) 688; *Delaware & Hudson Co., supra.*

---

[4] (b) If for any taxable year beginning after December 31, 1920, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount thereof shall be deducted from the net income of the taxpayer for the succeeding taxable year; and if such net loss is in excess of the net income for such succeeding taxable year, the amount of such excess shall be allowed as a deduction in computing the net income for the next succeeding taxable year; the deduction in all cases to be made under regulations prescribed by the Commissioner with the approval of the Secretary.

For the period January 1 to July 31, 1924, the Jr. Co. was not affiliated with the group, but was affiliated therewith from August 1 to December 31, 1924, and the succeeding years in controversy. Thus, as to the Jr. Co., the calendar year 1924 was divided into two periods, one before and one after affiliation, each of which constituted a " taxable year " as that term is used in section 206 (b) of the Revenue Acts of 1924 and 1926.[5] Cf. *Summerfield Co.*, 24 B.T.A. 829; 26 B.T.A. 440. Consequently, the period from January 1 to July 31, 1924, constitutes a " taxable year " prior to affiliation in 1924, and the period from August 1 to December 31, 1924, constitutes a " taxable year " after affiliation, in applying any of the Jr. Co.'s net losses to its own net income in the manner above stated.

The computation of the net losses sustained by the Consolidated Co. and the Jr. Co. will be made pursuant to the stipulations and the application thereof will be made in accordance with this decision, under Rule 50.

Issue No. 10 is in the alternative for Issue No. 9 in the event the Board had sustained the respondent's determination that the Consolidated Co. and the Jr. Co. were not affiliated with the Ritter Co. from May 15, 1923, to November 18, 1926, but were affiliated with each other during that period.

### *Issue Nos. 11 and 12—Foreign Tax Credit.*

As to Issue No. 11, the parties have stipulated all the facts necessary to a recomputation of the amount of the credit for foreign taxes to which the Ritter Co. is entitled in each of the years 1920 to 1928, inclusive, pursuant to the applicable revenue acts. Since the Ritter Co. owned a majority of the voting stock of the British corporation, the amount of the credit for the years 1920 to 1928, inclusive, must be computed pursuant to section 240 (c) of the Revenue Act of 1918 and section 238 (e) of the Revenue Acts of 1921, 1924, 1926, and section 131 (f) of the 1928 Act, which specifically limit the amount of the credit for foreign taxes which by those sections are deemed to have been paid by the Ritter Co. upon the dividends received by it in each of those years from the British corporation. The recomputation will be made under Rule 50, pur-

---

[5] If, for any taxable year, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount thereof shall be allowed as a deduction in computing the net income of the taxpayer for the succeeding taxable year (hereinafter in this section called " second year "), and if such net loss is in excess of such net income (computed without such deduction), the amount of such excess shall be allowed as a deduction in computing the net income for the next succeeding taxable year (hereinafter in this section called " third year ") ; the deduction in all cases to be made under regulations prescribed by the Commissioner with the approval of the Secretary.

suant to the stipulation and the specific provisions of those sections, after effect has been given to the decision on other issues affecting the amount of the Federal taxes and *a fortiori* the limitation as to the amount of the credits.

Issue No. 12 raises the following question: If the amount of the credit allowed, under Issue No. 11, for each of the years 1920 to 1928 is less than the amount of foreign taxes deemed to have been paid pursuant to the above mentioned sections of the various revenue acts, may the excess be allowed as a deduction from gross income as " Taxes paid or accrued within the taxable year " pursuant to section 234 (a) (3) of the Revenue Acts of 1918, 1921, 1924, 1926, and section 23 (c) of the 1928 Act?

The applicable provisions of the 1918, 1921, 1924, 1926, and 1928 Revenue Acts, although dissimilar in some respects, are substantially the same in so far as they affect this issue, and for convenience the designated sections of the 1921 Act will be used in our discussion of the question involved. While section 234 (a) (3) provides for a deduction from gross income of taxes " *paid or accrued* " within the taxable year except so much of foreign income, war and profits taxes " as is allowed as a credit under section 238," that section encompasses only taxes actually paid by or accrued against the taxpayer claiming the deduction. Subdivision (a) of section 238 provides for a credit for foreign taxes actually paid by the domestic corporation and (without deciding, for the issue is not before us) the unambiguous wording of section 234 (a) (3) would seem to permit a deduction of the excess of foreign taxes actually *paid* over the amount of such taxes allowed as a credit. However, subdivision (e) of section 238 is a special provision applicable where, as in this proceeding, the domestic corporation owns a majority of the voting stock of a foreign corporation from which it receives dividends not deductible from gross income under section 234 (a) (6). The amount of foreign tax thereby deemed to have been paid by the domestic stockholder corporation is, by the terms of the subdivision, a certain proportion of the income, war and excess profits taxes *paid by the foreign corporation* to a foreign country. The provisions of the subdivision are, by its own terms, only for the purposes of section 238, that is, the allowance of a credit under such circumstances, although the foreign tax was actually paid by the foreign corporation and not by the domestic corporation allowed a credit for a portion thereof.

We conclude that foreign taxes deemed to have been paid only for the purposes of section 238, in excess of the amount thereof allowed as a credit, may not be deducted from gross income under

section 234 (a)(3) as "taxes paid or accrued" by the domestic corporation.

*Issue No. 13—Deductibility of Certain Expenditures.*

With reference to the first group of expenditures made by the Ritter Co. and the Raleigh Co. during the years 1920 to 1927, inclusive, for the purpose of welfare work among their own employees at the mill and camp sites, which resulted in a direct benefit to their business by improving the morale and well-being of their employees, we are of the opinion that such expenditures constituted ordinary and necessary business expenses and should be allowed as deductions in the respective years. Cf. *Corning Glass Works* v. *Commissioner*, 37 Fed. (2d) 798; certiorari denied, 281 U.S. 742; *Missouri Pacific R.R. Co.*, 22 B.T.A. 267.

In connection with the second group of expenditures made by the Ritter Co. to the Columbus Community Fund during the years 1923 to 1928, inclusive, and those made by the Flooring Co. to a large number of charitable, religious and educational organizations, relief funds, and the like, during the years 1920 to 1928, inclusive, we are of the opinion that they are not deductible as ordinary and necessary business expenses under the various revenue acts applicable to those years. In the case of *Eitingon-Schild Co.*, 21 B.T.A. 1163, we reviewed numerous cases establishing and applying the rule that donations or contributions made by a corporation to charitable organizations are deductible *only* as ordinary and necessary business expenses, which conclusively implies that they bear a reasonable relation to the conduct of the corporation's business. The fact that some pressure is brought to bear upon the corporation either by a community chest organization or some of the corporation's customers interested in a particular charity, and the corporation makes the contributions to avoid criticism or possible ill will and to secure favorable publicity rather than through philanthropic considerations, is not sufficient to change the character of such contributions to a business expense. The relation of such donations to the proper conduct of the corporation's current business is too remote and incidental to result in any direct benefit reflected in increased earnings or otherwise. Cf. *Capital Traction Co.*, 27 B.T.A. 926; *Adam, Meldrum & Anderson Co.*, 29 B.T.A. 419; *Harry A. Koch Co.*, 23 B.T.A. 161; *Kansas City Southern Ry. Co.*, 22 B.T.A. 949; *Killian Co.*, 20 B.T.A. 80; *Stephens Fuel Co.*, 13 B.T.A. 666. The case of *Evening Star Newspaper*, 28 B.T.A. 762, is distinguished on its facts, for there the very existence of the taxpayer depended upon the general opinion and esteem of the public within its circulation radius. The taxpayer

itself took a lead in the campaign for funds from that same public, while, in the instant case, petitioners were merely solicited contributors. The case of *S. C. Toof & Co.*, 21 B.T.A. 916, is distinguished on its facts. There, in each instance where the amount of the contribution was allowed as a business expense deduction, the taxpayer had direct business relations with the contributee as a customer and the contribution resulted in a direct benefit reflected in increased profits to the taxpayer for the current year.

The fourth group of payments by the Ritter Co. in 1922 to four employees of an English corporation were made as rewards for meritorious services rendered to that foreign corporation which resulted in profits to the Ritter Co. because such foreign corporation was engaged in selling the Ritter Co.'s products. The four men were not employees of the Ritter Co. and it was under no legal obligation to make the payments. Clearly such expenditures were purely gratuities and did not constitute deductible ordinary and necessary business expenses of the Ritter Co. Cf. *Walter E. Kramer, Executor*, 27 B.T.A. 1043, 1050.

*Issue Nos. 14 and 46—Deductibility of Expenditures for Mine Equipment and for Dredging and Road Resurfacing.*

The facts show that during the years 1923 to 1928, inclusive, the Consolidated Co. and the Jr. Co. expended certain amounts as set out in petitioners' Exhibits 103 and 104, incorporated herein by reference, for steel rails, copper wire, mine cars and locomotives, mining machinery, fans, pumps, and motors, for the purpose of maintaining the normal output of their mines. Those items must be allowed as ordinary and necessary business expense deductions under authority of *West Virginia-Pittsburgh Coal Co.*, 24 B.T.A. 234, and *Hutchinson Coal Co.*, 24 B.T.A. 973; affd., 64 Fed. (2d) 275; certiorari denied, 290 U. S. 652.

We are of the opinion that petitioners have failed to establish that the tipple alterations made during 1923·to 1926, inclusive, fall in the class of those items above mentioned. While the alterations did not increase the normal output of the mines served by those tipples, the quality of the output was improved. In fact it appears that the market for the coal from those mines would have been lost but for those permanent improvements to the tipples which eliminated the slate from coal produced from two of the mines and separated the inferior coal from that of good quality produced from one of the mines. The tipple alterations constituted capital improvements and the respondent is sustained in disallowing deductions

therefor as business expenses. Cf. *Harriet B. Borland*, 27 B.T.A. 538; *Parkersburg Iron & Steel Co.*, 17 B.T.A. 74; affd., 48 Fed. (2d) 163.

The expenditures made during 1927 and 1928 by the Consolidated Co. for dredging Mitchell Branch Creek and resurfacing its private road, involved in Issue No. 46, were clearly capital expenditures, being permanent improvements which enhanced the coal properties and not in the nature of equipment used solely for the purpose of maintaining normal production of the mines in those years. The respondent is sustained in disallowing the items as deductions for business expenses. Cf. *Colony Coal & Coke Corp.*, 20 B.T.A. 326; affd., 52 Fed. (2d) 923; *Manistique Lumber & Supply Co.*, 29 B.T.A. 26.

### Issue No. 21—Statute of Limitations.

On March 15, 1921, the Ritter Co. filed its return for the year 1920. Section 250 (d) of the Revenue Act of 1918 provided for a five-year period of limitation for assessment, that is, until March 15, 1926. The first waiver with respect to the year 1920 was not executed until October 27, 1926, more than seven months after the expiration of the statutory period and the second waiver was executed on October 5, 1927. Upon authority of *Helvering* v. *Newport Co.*, 291 U.S. 485, the waiver of October 27, 1926, revived the Ritter Co.'s tax liability for 1920, and, pursuant to section 278 (c) of the 1926 Act and the terms of that waiver, the assessment could be made at any time up to December 31, 1927. The timely waiver dated October 5, 1927, extended the period for assessment until December 31, 1928. The deficiency notice was mailed on December 27, 1928. Accordingly the assessment of any additional taxes against the Ritter Co. for 1920 was not barred at the date of the mailing of the deficiency notice.

As to the Ritter Co. for the years 1922 and 1923, the Raleigh Co. for the years 1920 to 1923, inclusive, and the Big Sandy Co. and the Knox Creek Co. for the year 1923, the facts show that waivers were duly executed by the parties prior to the expiration of the statutory periods as provided by section 250 (d) of the Revenue Acts of 1918 and 1921, and that the periods of limitation were subsequently extended by timely valid waivers executed pursuant to section 278 (c) of the Revenue Acts of 1924 and 1926, so that assessment could have been made at any time up to December 31, 1928. The respondent's notices of deficiencies were mailed to these petitioners on December 27, 1928. Assessment of any additional taxes against them for the years considered in this paragraph was not barred at the date of the mailing of the deficiency notices. Cf. *Chadbourne & Moore, Inc.*, 16 B.T.A. 1054.

*Issue No. 22—Employees' Stock Bonus.*

This issue involves the question of whether the issuance of common stock by the Ritter Co. during the years 1919 to 1922, inclusive, to certain selected employees, as detailed in our findings of fact, was pursuant to a sale of stock to the employees as determined by respondent, or was pursuant to an executed plan by which there was a sale of stock to the employees at a stated price and, also, the payment of additional compensation measured by the difference between the sale price and the fair market value per share on the date of issuance, as contended by petitioner, the Ritter Co.

The respondent calls our attention to the fact that the Board and the courts have held that no realized and therefore no taxable gain results from the bona fide purchase of stock or property at a price less than the fair market value thereof, *Miles* v. *Safe Deposit & Trust Co.*, 259 U.S. 247; *Rose* v. *Trust Co. of Georgia*, 28 Fed. (2d) 767; *George W. Van Vorst, Executor*, 22 B.T.A. 632; affd., 59 Fed. (2d) 677. He then cites *Durkee* v. *Welch*, 49 Fed. (2d) 339, as authority for his position here. In that case the court found that the taxpayer purchased stock under an employee's stock purchase plan which did not involve any question of a bonus. It differentiated, and refused to consider as material to the issue before it, three earlier disassociated stock purchase plans offered by the same company which did involve a bonus payment. The court held there was merely an offer to the employees to buy stock at par on deferred payments and when the stock was fully paid and delivered in 1925 the then value thereof in excess of cost was neither a gift nor a bonus, and was not realized gain to the employee.

Here the agreement between the Ritter Co. and each employee contained all elements of a binding contract for a sale and purchase of stock at a stated price to be paid within ten years by cash payments and/or the credit of dividends applicable to those shares held as collateral for the employee's note. In this respect the case is similar to the facts in *Gardner Governor Co.*, 27 B.T.A. 1171, in which the Board disallowed the claimed deduction upon a failure to establish that at the inception of the employees' stock purchase plan the parties considered as compensation the value of the stock in excess of the agreed purchase price. However, in the present controversy the circumstances and conditions surrounding the execution of each contract disclose that the intention of the parties was not only a purchase and sale of stock, but in addition thereto and, primarily, the payment by the Ritter Co. of a stock bonus, as compensation for services actually rendered. The amount of this bonus was predetermined to be the difference between the purchase price

and the market value of the number of shares allotted to each employee. It was based on his salary, length of service, and efficiency. These facts bring this case within the rule laid down in *Haskell & Barker Car Co.*, 9 B.T.A. 1087, and *Alger-Sullivan Lumber Co.*, 57 Fed. (2d) 3. Also, cf. *Robinson* v. *Commissioner*, 59 Fed. (2d) 1008.

We hold that the difference between the purchase price and the fair market value on the date each of the series of contracts were entered into, that is, the date of acquisition of the stock by the employees, constituted reasonable additional compensation for services rendered and was a proper deduction in determining Ritter Co.'s taxable net income during the years in controversy.

### Issue No. 23—Dividend Credits on Stock Not Paid For as Compensation.

Under Issue No. 22 we determined that the stock issued to employees under the stock purchase plan was sold to them on the date the respective agreements were executed. Accordingly, the dividends, when declared, were paid to the employees as dividends, not as compensation, but were to be credited immediately on the purchase price under the terms of the agreement of the parties. The respondent did not err in disallowing deductions for such dividends as compensation.

### Issue No. 24—Invested Capital as Related to Issue No. 22.

As to the year 1920 the Ritter Co. contends that in effect it sold stock to its employees for its market value of $271.72 per share, of which $161.72 per share was paid in by services rendered (the bonus); and $110 represented accounts receivable from employees for stock.

The respondent, in computing invested capital for 1920, has taken $110, the price per share stated in the 1920 contract, as the actual cash bona fide paid in for such stock within the meaning of section 326 (a) of the 1918 Act, although such amount was represented by accounts receivable. That action was correct. *Haskell & Barker Car Co.*, *supra*. The excess value of the stock in the amount of $161.72 was paid out by the Ritter Co. as reasonable compensation for services rendered and has been allowed as a deductible expense. It is inconsistent for petitioner to claim that the value of such services should be at the same time capitalized. Upon the facts that the regular and ordinary services rendered were not worth more than the compensation paid by the issuance of stock and were not actual contributions to capital in exchange for stock, the amount of $161.72 per share was properly excluded from invested capital by respond-

ent. Cf. *Wells Brothers Co. of Illinois*, 16 B.T.A. 79; *Kent Paper Co.*, 13 B.T.A. 273; *Crown Potteries Co.*, 12 B.T.A. 1412; *Klamer-Goebel Furniture Co.*, 11 B.T.A. 1322.

*Issue No. 30—Invested Capital—Rough Lumber Inventories.*

This issue was raised upon petitioner's assignment of error stated as follows: "Understatement of invested capital for the year 1920 by unwarranted reduction in the Ritter and Raleigh Companies' rough lumber inventories at January 1, 1920."

In determining the value of rough lumber inventories of the Ritter Co. and the Raleigh Co. as of January 1, 1920, for the purpose of computing income for 1920, the respondent has properly used the March 1, 1913, depletion value per thousand feet. Petitioners agree that his computative method is correct. The result thereof is that petitioners are permitted to recover, exempt from tax, the excess of the March 1, 1913, value over cost in addition to the actual cost. That differential is termed "realized appreciation", meaning that the subject matter of depletion has been severed from the land, passed through the inventory, and sold, and the excess of March 1, 1913, value over cost has been realized by sale, which, although actually income, is tax free. Cf. *Clearfield Lumber Co.*, 3 B.T.A. 1282, 1288.

In determining rough lumber inventories of the two companies as of January 1, 1920, for the purpose of computing invested capital for 1920, the respondent has used actual cost per thousand feet, which is less than the March 1, 1913, value. Petitioners contend that this is error and that the inventory value used in computing invested capital should be increased to equal the inventory value used in computing income. Petitioners' argument is that invested capital includes earned surplus and that the above mentioned differential of "realized appreciation" as of January 1, 1920, has augmented earned surplus and undivided profits and that, to properly reflect the amount of the latter, the March 1, 1913, inventory value must be used in computing invested capital, instead of the lesser figure, cost.

The Board and the courts have held that there may not be included in invested capital the appreciation in value of capital assets occurring subsequent to their acquisition. *H. T. Cushman Mfg. Co.*, 2 B.T.A. 39; *Jamison Coal & Coke Co.*, 24 B.T.A. 554, 568; *La Belle Iron Works* v. *United States*, 256 U.S. 377. Petitioners agree with this well established principle as applied generally to capital assets such as those involved in those cases, but contend that the question here is not controlled by those decisions, since it involves the value of inventories, which automatically affect earned surplus and undivided profits.

The issue as framed does not state the real controversy, because the valuation of inventories at a figure other than cost affects only net income and not invested capital. The latter is a statutory concept which includes earned surplus and undivided profits as one of its factors. Sec. 326 (a)(3), Revenue Act of 1918. What the petitioners are seeking relief from, is not an understatement of inventories because based upon cost for invested capital purposes, but an alleged understatement of earned surplus to the extent that it does not include that portion of prior deductions for depletion applicable to the excess of March 1, 1913, value over actual cost, in respect of the timber used in the manufacture of the rough lumber in the inventory.

Petitioners have failed to establish that respondent has not restored to earned surplus deductions allowed for depletion applicable to such excess of March 1, 1913, value over cost. Accordingly, upon such failure of proof of a material fact, we must deny petitioners the relief sought in this issue and sustain the respondent's determination.

*Issue No. 33—Depletion Calculation for Inventories.*

On brief, respondent agrees that in determining the cost of lumber manufactured in 1920 by the Raleigh Co. in arriving at the closing inventory at December 31, 1920, he will use the amount of depletion allowed the Raleigh Co. as a deduction for 1920, as contended for by petitioner, instead of the amount used by him in his computation of the pending deficiency. However, the depletion deduction allowed by respondent was based upon the March 1, 1913, value of the Raleigh Co.'s timber as determined by him. In Issue No. 1 we redetermined the correct March 1, 1913, value which should be used for computing the depletion deduction for 1920 and effect thereto will be given in the recomputation on this issue under Rule 50.

*Issue No. 34—Application of any 1921 Net Loss.*

No deficiencies have been determined against any of these petitioners for the year 1921. However, pursuant to the provisions of section 272 (g) of the Revenue Acts of 1928 and 1932, the Board, in redetermining a deficiency in respect of any taxable years in question, may consider such facts with relation to the year 1921 as may be necessary to determine correctly the amount of the deficiencies in controversy, although it has no jurisdiction to determine whether the taxes for 1921 have been overpaid or underpaid. *Greenleaf Textile Corp.*, 26 B.T.A. 737; affd., 65 Fed. (2d) 1017.

The parties have stipulated certain facts and, as in other issues, the record contains the computative data for determining any net losses petitioners may have sustained, after giving effect to the Board's decision on the other issues applicable to 1921 as well as the years in controversy. The net losses, if any, should be computed pursuant to section 204 of the Revenue Act of 1921 and applied in the succeeding taxable years 1922 and 1923 in the manner set out in our decision on Issues 9 and 10.

In addition to the question of net losses for 1921 our decision upon certain issues as to years in question are applicable to years for which no deficiencies have been determined against some of the petitioners and, pursuant to section 272 (g), *supra*, in recomputing the petitioners' tax liability under Rule 50 for the years in controversy, effect will be given to the Board's decision as to those other years in so far as it may be necessary to determine correctly the deficiencies in controversy.

*Issue No. 35—Gain or Loss on Sale of Big Sandy Stock—March 1, 1913, Value of Big Sandy Stock.*

In 1923, pursuant to the agreement incorporated in our findings by reference, the Ritter Co. sold 1,000 shares of Big Sandy Co. stock to the Norfolk & Western Railway Co. and certain railroad property to the Big Sandy Co. The Ritter Co. had acquired 500 shares prior to March 1, 1913, and 500 shares subsequent to that date. While this issue involves the gain derived or loss sustained upon that transaction in 1923, the primary question is the March 1, 1913, value of the 500 shares of Big Sandy Co. stock acquired by the Ritter Co. prior to that date.

Apparently the Ritter Co. reported on its return a gain computed on the basis of cost. The respondent increased the amount of gain, computing the same on the basis of cost as determined by him. Petitioner now contends that 500 shares of the Big Sandy Co. stock had a fair market value of at least $1,000,000 on March 1, 1913, and that, the sale price being in excess of cost but less than the March 1, 1913, value, there was neither taxable gain derived nor a deductible loss sustained on the sale in 1923. Petitioner further contends that the value of the stock on the basic date is not to be fixed by the value of the Big Sandy railroad as actually constructed at that time, that is, a small narrow gauge line designed and operated primarily in the interest of the Ritter Co.'s lumbering business, or, as petitioner's counsel states on brief, " It is immaterial that the Big Sandy Company may have (been) then set up even as a losing ' Toonerville Trolley ' passing through raw and sparsely settled country. For all we are concerned, there may have been no railroad actually in

existence at the time." Further, petitioner contends that the value of the stock is to be fixed by what earnings one could reasonably anticipate at March 1, 1913, because of the stock's inherent attributes, that is, that the Big Sandy Co. could have built under its charter a standard gauge railroad 58 miles long at an estimated cost of $5,644,826, at March 1, 1913, over the reconstructed route completed in 1929 by the Norfolk & Western Railway Co. at a cost of approximately $8,000,000. That if such a railroad had been built at March 1, 1913, there could have been anticipated the development, within two or three years, of an estimated traffic per year amounting to 5,000,000 tons of coal, 200,000 tons of lumber, 100,000 tons of other freight such as machinery, supplies, animals, foodstuffs, store goods, etc., 400 round trip passengers each day, 1,500 pounds of mail each day and also some express traffic, and, further, certain estimated earnings on such traffic through the development of the theretofore dormant region which would almost automatically blossom into intensive mining and industrial activity because of the coming of such a railroad. The greater portion of such estimated traffic was supposed to originate from the Levisa River watershed, since the larger part of the reconstructed road would have been along the Levisa River, then across the divide and down Knox Creek to Devon, using about 12 miles of the Big Sandy roadbed as it existed at March 1, 1913, along Knox Creek and Slate Creek.

Petitioner has placed in evidence the Big Sandy Co.'s charter and argues that under its provisions the Big Sandy Co. had the exclusive right to construct and operate a railroad in the Buchanan County territory and that therefore no other railroad could have built a feeder line to amass the anticipated traffic and earnings through development of the natural resources of that territory, without acquiring the Big Sandy Co.'s stock. We doubt whether the existence of the Big Sandy Co.'s charter would have prohibited another company from securing a charter to build a railroad in the Buchanan territory (for instance along Levisa River) so long as it did not parallel the road which the Big Sandy had constructed and operated along Knox Creek and Slate Creek. However, we deem it unnecessary to determine that question of law.

We have given careful consideration to the testimony of petitioner's witnesses and their qualifications, the maps and schedules placed in evidence, the facts relating to the construction and operation of the Big Sandy road, the nature of the territory, including the population and natural resources, and the possibility of other railroads building feeder lines into that territory. Petitioner's expert witness on railroad valuation gave the factors which are customarily used in valuing railroads and, in the main, those factors

are based on facts known or more or less definitely ascertainable as of the date for which the valuation is being made. That is as it should be. But in giving his expert opinion that the 500 shares of Big Sandy Co. stock had a fair market value of $1,500,000 on March 1, 1913, the sole basis therefor was the preceding witnesses' testimony of estimates of anticipated traffic and earnings if the Big Sandy Railroad had been reconstructed as a standard gauge road and along an almost entirely different route. But even more serious than that, the record shows no foundation in fact for the estimates of so large an amount of traffic which, in our opinion, are only conjecture. The Board is not bound by opinion of experts. *Anchor Co.* v. *Commissioner*, 42 Fed. (2d) 99; *Bourne* v. *Commissioner*, 62 Fed. (2d) 648. Sound judgment rejects a value of $1,000,000 for the 500 shares of Big Sandy Co. stock at March 1, 1913. On the other hand, all of the testimony and evidence is directed to establish that value and, since that figure is rejected, we are unable to find any March 1, 1913, value in excess of cost.

The sale of the stock and other properties constituted one transaction on which the Ritter Co. realized in 1923 a taxable profit in the amount of $193,224.89, computed as set out in our findings of fact.

*Issue No. 39—March 1, 1913, Value of Norfolk & Chesapeake Coal Co. Stock and Gain or Loss on Sale.*

In 1924 the Consolidated Co. sold 1,020 shares or 51 percent of the outstanding stock of the Norfolk & Chesapeake Coal Co. for $140,000. Of those shares, 510 were acquired in 1908 and 510 were acquired in 1922 by a stock dividend. Respondent determined that the stock had a March 1, 1913, value of $118.79 per share or $60,582.90 for the 510 shares, based on the net worth of the tangible assets of the Norfolk & Chesapeake Coal Co. Petitioners contend that the March 1, 1913, fair market value of the 510 shares was at least $150,000, based on the value of the tangible assets, plus the value of good will represented by the contracts for which stock was issued. No question has been raised as to cost.

The uncontradicted testimony of petitioners' witness clearly proves that the stock had a value in excess of that determined by respondent. Prior to 1908 the H. T. Wilson Coal Co. had established a market for the coal produced from its own mines, the Consolidated Co.'s mines and others. The sales contracts for which Norfolk & Chesapeake Coal Co. issued 60 percent of its stock in 1908 carried with them the good will which had theretofore been established. Petitioners' witness valued the 510 shares at $150,000, based on earnings

which he followed from month to month from the date of organization of the Norfolk & Chesapeake Coal Co.

The stock was not listed on any exchange and no sales thereof were made at or near March 1, 1913. In the absence of sales, the value of the stock must be determined by the value of the underlying assets, the financial condition and other factors affecting the business of the corporation. Cf. *Lillian G. McEwan*, 26 B.T.A. 726; *J. G. Robertson*, 28 B.T.A. 53. As a check upon opinion valuations of intangible assets, the Board has approved the use of the formula set out in A.R.M. 34, C.B. 2, p. 31. Cf. *Alexander D. Falck*, 26 B.T.A. 1359, 1365. By reducing the average earnings for 6 fiscal years, March 31, 1911, to March 31, 1916, inclusive, by 10 percent of the average tangibles for that period and capitalizing the remaining earnings at 15 percent, we arrive at a value of intangibles which, together with the value of tangibles, results in a value of approximately $130,000 for the 510 shares.

We have carefully considered all the oral testimony and documentary evidence in reference to the organization and growth of the business of the Norfolk & Chesapeake Coal Co., its sales, profits, tangible assets, and good will, as well as the opinions on valuation. We conclude, and have so found, that the March 1, 1913, fair market value of the 510 shares of Norfolk & Chesapeake Coal Co. stock owned by the Consolidated Co., on that date was $130,000, and that the taxable gain realized by the Consolidated Co. on the sale in 1924, was $10,000. Proper adjustment will be made under Rule 50.

### Issue No. 41—Apportionment of Tax.

Section 240 (b) of the Revenue Acts of 1924 and 1926 provides:

In any case in which a tax is assessed upon the basis of a consolidated return, the total tax shall be computed in the first instance as a unit and shall then be assessed upon the respective affiliated corporations in such proportions as may be agreed upon among them, or, in the absence of any such agreement, then on the basis of the net income properly assignable to each. There shall be allowed in computing the income tax only one specific credit computed as provided in subdivision (b) of section 236.

Respondent contends that the filing of Form 1122 for the years 1925 and 1926 by the Consolidated Co. and the Jr. Co., with the statement thereon that no tax was to be allocated to them, is not sufficient to show an agreement, within the meaning of the above quoted section, between the corporations included in the consolidated return filed by the parent (Ritter) company for those years.

It is not necessary that such agreement be in writing or in any particular form. It is sufficient if the conduct of the parties and the record clearly and definitely advises the respondent how the consoli-

dated tax is to be allocated and assessed. Cf. *Himelhoch Bros. & Co.*, 26 B.T.A. 541; *Washburn Wire Co.*, 26 B.T.A. 464 and 1146; affirmed on this issue, 67 Fed. (2d) 658.

Here, the parent (Ritter) company filed consolidated returns, the subsidiaries filed information returns on Form 1122 stating that none of the tax was to be allocated to them, and the tax shown on the consolidated returns was assessed against and paid by the Ritter Co. in the amounts of $119,866.69 for 1925 and $153,440.88 for 1926. Furthermore, the respondent has treated those returns as an agreement and has assessed against the Ritter Co. all of the additional tax for 1925 and 1926 with respect to all of the corporations included in the original consolidated returns except the Consolidated Co. and the Jr. Co. The latter two corporations were ruled out of the affiliation by respondent for 1925 and for the period January 1 to November 17, 1926. In determining the deficiencies against the Ritter Co. for 1925 and 1926, he reduced the amount of taxes previously paid by it, by amounts allocated to those two subsidiaries; that is, he credited the Consolidated Co. and the Jr. Co. with taxes previously paid by the Ritter Co. However, in Issue No. 8 we held that the Consolidated Co. and the Jr. Co. were affiliated with the Ritter Co. during 1925 and the period January 1 to November 17, 1926. Any additional tax due upon their incomes for such period will be allocated to the Ritter Co. just as the respondent has done with respect to the other corporations included in the consolidated returns for 1925 and 1926.

*Issue Nos. 43, 44, 45—Loss on Liquidation of Subsidiaries.*

All three of these issues involve two questions of law, namely: (1) Does taxable gain or deductible loss result to the parent corporation when its subsidiary corporation liquidates and dissolves? (2) If such a loss is deductible, should it be adjusted or reduced by the total amount of operating losses sustained by the subsidiary in prior years in which such losses were offset against operating income of the parent corporation by deductions taken in consolidated tax returns filed for such prior years during which the corporations were affiliated?

The first question must be answered in the affirmative under authority of *Remington Rand, Inc.* v. *Commissioner*, 33 Fed. (2d) 77; certiorari denied, 280 U.S. 591; *Southwestern Ice & Cold Storage Co.*, 27 B.T.A. 190; *Canal-Commercial Nat. Bank*, 22 B.T.A. 541; affd., 63 Fed. (2d) 621; certiorari denied, 290 U.S. 628, with respect to gains on such a transaction; and *Riggs Nat. Bank*, 17 B.T.A. 615; affd., 57 Fed. (2d) 980; *Carey Salt Co.*, 26 B.T.A. 675; *Houghton & Dut-*

*ton Co.*, 26 B.T.A. 1420; *Vonnegut Hardware Co.*, 28 B.T.A. 784, with respect to losses on such a transaction.

As to the second question the decisions of this Board and of the courts have not been uniform. Following the decision in the *Remington Rand* case, *supra*, which reversed 11 B.T.A. 773, and held that the liquidation and dissolution of a subsidiary is a transaction resulting in taxable gain or deductible loss, but that the gain should not be reduced by the prior earnings of the subsidiary, the Board decided the *Riggs Nat. Bank* case, *supra*, and followed the *Remington Rand* case as to such a transaction resulting in gain or loss, but held that the loss deductible for the period outside of affiliation must be reduced by the amount of the subsidiary's operating loss sustained during the period of affiliation and deducted on the consolidated return. The purchase of the stock and liquidation of the subsidiary occurred within the calendar year 1922. The *Riggs Nat. Bank* case, *supra*, has been cited and followed in subsequent Board cases too numerous to mention.

However, in the *Carey Salt Co.*, *supra*, the Board allowed, as a deduction, a loss sustained upon liquidation of a subsidiary in the total amount of advances and loans by the parent to the subsidiary during the several years of affiliation, without any adjustment or reduction on account of the subsidiary's losses sustained in those prior years and deducted in consolidated returns, citing among other cases *United Publishers' Corp.* v. *Anderson*, 42 Fed. (2d) 781; *Remington Rand, Inc.*, *supra; Aluminum Goods Mfg. Co.* v. *Commissioner*, 56 Fed. (2d) 568; *Riggs Nat. Bank*, *supra*. In the case of *Houghton & Dutton Co.*, *supra*, the Board followed the *Riggs Bank* case in holding that the loss sustained on liquidation should be reduced by the subsidiary's operating loss sustained during the period of affiliation within the same year, which had been reflected in consolidated income for that period, but that no losses of the subsidiary in prior years should be carried forward to the current year to reduce the loss sustained on liquidation of the subsidiary (citing *United Publishers' Corp.* v. *Anderson*, *supra*). In this latter case the court decided that the loss sustained on liquidation was deductible without consideration of deductions for losses of prior years on the consolidated returns, for the reason that the question was the converse of that of the amount of gain realized on such a transaction as was present in *Remington Rand, Inc.*, *supra*.

In *Aluminum Goods Mfg. Co.*, 22 B.T.A. 1, the Board disallowed a claimed deduction for a loss sustained on liquidation of a subsidiary on the ground that, since formal dissolution had not occurred, it was an intercompany transaction. The decision was reversed, 56 Fed. (2d) 568, the court holding that the loss was not an intercompany transaction. In that case the subsidiary was organized in

1914 and sustained net losses for 1914, 1915, 1916, and 1917. The parent company (*Aluminum Goods Mfg. Co.*) and the subsidiary company filed separate returns for normal tax for all of those years, but for 1917, filed consolidated returns for excess profits tax. The subsidiary was completely liquidated by the end of 1917 and formally dissolved in February 1918. The loss claimed by the parent company on the consolidated return was the amount of its investment in the stock of and advances to the subsidiary, *less* the subsidiary's operating loss for 1917 which was deducted on that current year's consolidated return. Upon appeal of that case, in *Burnet* v. *Aluminum Goods Mfg. Co.*, 287 U.S. 544, the Supreme Court held that while affiliation was not ended by mere liquidation of the subsidiary, the method of accounting to be applied to consolidated returns must not withhold from a taxpayer all benefit of deduction for losses actually sustained and deductible under the sections governing the computation of taxable income, when at the same time such method of accounting would not further the very purpose for which consolidated returns are required, that is, primarily to preclude distortion of taxable income by intercompany transactions. The Supreme Court pointed out that the subsidiary's losses for 1914, 1915, and 1916 could not be deducted from the profits of the parent company because no consolidated returns were filed for those years. It was said, further, that so far as the loss from operation of the subsidiary in earlier years contributed to the parent company's capital loss in 1917, deduction of the latter in the consolidated return involved no double deduction of losses of the business of the two companies during affiliation, for the total loss in 1917 was reduced, before deduction in the consolidated return, by the amount of the subsidiary's operating loss for that year. In allowing the claimed deduction the Court said: " While equitable principles of accounting applied to the calculation of the net income of the business unit do not permit deduction of the loss twice, they do require its deduction once."

Following that decision of the Supreme Court, the Circuit Court of Appeals, Tenth Circuit, in a well considered opinion in the case of *Hernandez* v. *Charles Ilfeld Co.*, 66 Fed. (2d) 236, decided that the loss sustained upon the complete liquidation of a subsidiary, and comprising the investment in its stock and advances, was a real loss suffered by the parent company as a separate corporate entity, but that such total loss must be reduced by the total deductions theretofore allowed in the consolidated return on account of the subsidiary's operating losses in prior years. In that case the losses of prior years, so allowed as deductions, exceeded the total loss sustained by reason of the purchase, operation and liquidation and no deduction was allowed on account of the latter. Following that decision the Circuit

Court of Appeals, Ninth Circuit, which had decided the *Riggs Nat. Bank* case, *supra*, had before it for review this Board's decision in the *Apartment Corp.*, 26 B.T.A. 849, in which the Board allowed the loss sustained upon liquidation of a subsidiary without any reduction thereof for the subsidiary's losses deducted in consolidated returns for prior years. The court's decision, reported at 67 Fed. (2d) 3, reversed the Board and held that the losses allowed in prior years in the consolidated returns exceeded the total loss on liquidation and that no additional deduction upon the liquidation could be properly allowed. For reasons stated, the court disagreed with the conclusion reached in the case of *McLaughlin* v. *Pacific Lumber Co.*, 66 Fed. (2d) 895.

In *Summerfield Co.*, 29 B.T.A. 77, the petitioner therein sustained a loss of $135,000 invested in stock, and $156,693.03 on advancements, upon a liquidation of a subsidiary. In prior years a total of $155,581.19 had been deducted in consolidated returns for losses of the subsidiary. In allowing a deduction for loss on liquidation, the Board held that " the loss sustained upon the stock investment should be allowed in full." It then held that, " the loss on open account should be reduced by the amount of the Taylor Company's (subsidiary's) operating losses previously included in the consolidated returns during affiliation, leaving a balance of $1,111.84, which may now be deducted." Although the loss there sustained on advancements was in excess of the amounts deducted in consolidated returns for prior years for losses of the subsidiary, that decision might be construed as deciding that the loss on the investment in the stock upon liquidation may not be reduced in a like manner where there had been no advancements or where the deductions in prior years were in excess of the loss on advancements.

Our conclusion is that the total loss sustained upon the complete liquidation of an affiliate, including the investment in its stock and advances made to it and properly deductible from income upon the termination of affiliation by dissolution, must be reduced by the total losses sustained by such affiliate in prior years for which consolidated returns were filed and on which such losses were taken as a deduction from consolidated income in those years.

As to Issue No. 43, the Ritter Co. owned all the stock of the Winding Gulf Co. acquired at a cost of $2,500. Upon dissolution of the latter in 1926 the Ritter Co. received $912.22 in exchange for such shares. In consolidated returns filed for prior years during which they were affiliated there was deducted a total of $411.54 for losses sustained by the Winding Gulf Co. However, of that latter amount, $33.49 was deducted for the year 1917, for which a consolidated return was filed only for excess profits tax purposes. We are here concerned with normal tax and, inasmuch as such amount

of $33.49 has not heretofore been deducted in a consolidated return for normal tax, the allowance in the year in question will not result in a double deduction from the Ritter Co.'s income subject to normal tax. Accordingly, the Ritter Co. is entitled to a deduction in 1926 for the loss sustained upon the liquidation and dissolution of the Winding Gulf Co., but such loss, amounting to $1,587.78, must be reduced by $378.05, the amount of the latter's losses deducted in prior years in consolidated returns for normal tax.

As to Issue No. 44, the Ritter Co. owned all of the stock of the Smoky Mountain Co., acquired at a cost of $50,000. Upon the liquidation and dissolution of the latter in 1927, the Ritter Co. realized nothing on such investment in the stock, nor on the amount of $28,920.88 cash advances theretofore made by it to the Smoky Mountain Co. In 1927 the Ritter Co. charged off such amount of $28,920.88 as a worthless debt. For the years 1917 to 1927 losses of the Smoky Mountain Co., aggregating $49,403.69, were deducted in consolidated returns for those years for which they were affiliated. Of that latter amount, $5,291.88 was deducted in a consolidated return for 1917 only for excess profits tax purposes. The total deductible loss in the amount of $78,920.88 sustained in 1927 on liquidation of the Smoky Mountain Co. must be reduced by $44,111.81, the amount of the latter's losses deducted in prior years in consolidated returns for normal tax.

As to Issue No. 45, the Consolidated Co. owned all of the stock of the Hull Coal & Coke Co., acquired in 1904 at a cost of $105,000. Upon liquidation and dissolution of the latter in 1927, the Consolidated Co. realized nothing upon such investment. The amount of $105,000 was deducted as a loss in the consolidated return for 1927 and the respondent disallowed it. From January 1, 1923, until date of dissolution, the Hull Coal & Coke Co. was included in the consolidated returns filed by the Ritter Co. and its claimed affiliates. Respondent determined that the Consolidated Co., the Jr. Co., and the Hull Coal & Coke Co. were not affiliated with the Ritter Co. prior to November 18, 1926. In Issue No. 8 it was shown that respondent determined that the Consolidated Co. and the Jr. Co. were affiliated as between themselves for several years prior to November 18, 1926, and, upon the fact that Consolidated Co. owned all stock of the Hull Coal & Coke Co. since 1904, it is presumed that the latter was included in the affiliation determined by respondent to exist between the Consolidated Co. and the Jr. Co. The stipulated facts on this issue do not show what deductions, if any, were taken and allowed, in consolidated returns for years prior to 1927 in which the Consolidated Co. and the Hull Coal & Coke Co. were included as affiliated corporations, on account of any operating losses sustained

in those years by the Hull Coal & Coke Co. If any such deductions have been allowed, they will be used to reduce the loss of $105,000 now claimed by the Consolidated Co., so as to eliminate any double deduction. This is merely a mathematical computation which will be made by the parties under Rule 50.

### Issue No. 49—Depreciation.

This issue is in the alternative for Issue No. 14 and alleges that respondent failed to allow depreciation for the years 1922 to 1928 on expenditures made by the Consolidated Co. and the Jr. Co. which were held by respondent to be capital expenditures. Disposition of this issue is made in the stipulation as to Issues Nos. 15 to 18 incorporated hereinabove by reference, and effect thereto will be given in the recomputation under Rule 50.

Reviewed by the Board.

*Judgment will be entered pursuant to Rule 50.*