HASKELL & BARKER CAR CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7009. Promulgated January 7, 1928.

*James H. Winston, Esq.,* and *Edward G. Ince, Esq.,* for the petitioner.

*John D. Foley, Esq.,* for the respondent.

1088

OPINION.

Morris: The first allegation of error is the failure of the respondent to allow as a deduction for the fiscal year ended January 31, 1919, an amount of $17.50 per share (difference between the stipulated market price of $42.50 and sale price to employees) on the stock which had not been paid for in full in the computation of net income. The respondent alleges and contends that there was no binding obligation upon the petitioner, certainly not more than contingent liability until the stock in question was fully paid for by the employee and his certificate of stock delivered to him. Therefore, the respondent contends, the bonus of $17.50 should not be allowed as a deduction until the payments are completed by the employee. The petitioner, on the other hand, contends that there was a binding and enforceable contract between the petitioner and its employees and that the bonus sought to be paid by this agreement was for services

actually rendered within the fiscal year ended January 31, 1919, and therefore the sum claimed as a deduction in that year should be allowed as provided for in section 234 (a) of the Revenue Act of 1918. Section 234 (a) (1) of the Revenue Act of 1918 provides that in computing the net income of a corporation subject to the tax imposed by section 230, there shall be allowed as deductions, "(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *." The words "paid or incurred" as used in the above section are defined in section 200 of the same Act as follows:

The term "paid," for the purposes of the deductions and credits under this title, means "paid or accrued" or "paid or incurred," and the terms "paid or incurred" or "paid and accrued" shall be construed according to the method of accounting upon the basis of which the net income is computed under section 212.

Section 212 (b) of the same Act provides that, "The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer." In this case there seems to be no dispute over whether the sums in question were "ordinary and necessary" or whether the sums constitute a "reasonable allowance." Nor is there any doubt expressed as to the right of the petitioner to deduct a bonus as such in computing its net income. *Appeal of W. H. Harris Grocery Co.*, 3 B. T. A. 216. Therefore we are only called upon to determine whether or not the $17.50 per share on stock contracted to be sold to the employees but not already paid for within the fiscal year ended January 31, 1919, is "paid or incurred during the taxable year" as provided for in the statute. In deciding this point in issue it will be necessary, not only to construe the writing entered into between the parties, but to determine from the oral testimony of witnesses and all the surrounding circumstances which caused the parties to contract with each other, what the intention of these parties was. *Appeal of Converse & Co.*, 1 B. T. A. 742, and *Appeal of Arthur B. Grover*, 3 B. T. A. 508.

Let us first, therefore, examine briefly some of the pertinent terms of the minutes of the board of directors of November 21, 1918, referred to in the findings of fact. The committee appointed to work out the plan of the stock bonus "for the purpose of providing compensation to the president, chief executive and operating employees of the company, in addition to their respective salaries for services actually rendered during the year * * *" recommended the purchase of 5,000 shares of stock in addition to the 5,000 shares held in

the treasury and that 5,000 shares be sold to the president at $25 per share, the committee stating with respect to this sale "the difference between that price on said 5,000 shares and the present market price, is a reasonable compensation to the president, in addition to his salary, for his services actually rendered to the company during the year." There was also a similar provision with respect to the chief executive and operating employees. The terms of the above committee's recommendation were adopted by resolution of the board of directors.

Therefore, insofar as the intention of the petitioner is concerned, there can be no question but that it intended the amount in controversy to cover compensation in addition to the salaries already paid for services actually rendered to the company "during the year." Some obligation was certainly incurred within the taxable year in question. An agreement was drawn up to carry out the resolution of the board of directors by the vice president of the company, who was not a lawyer and skilled in the drafting of legal instruments. The preamble to the contract simply recites that the company is desirous of compensating the employee further and that it has authorized the offer of a bonus in the form of subscription right.

The first numbered paragraph of the contract recites "the company offers you a right to subscribe for _____ shares of the above-mentioned stock of the company, at a price of $25.00 per share."

The second numbered paragraph provides for the manner of payment and specific provisions that the failure to complete payment within the specified period shall cause the subscription right to lapse. That paragraph further provides "and the company will return to you the net profit, if any, accruing to you, over the carrying charges."

The third numbered paragraph provides that the company shall have possession of the certificate of stock pending completion of payment.

The fourth numbered paragraph provides that the company shall pay dividends on this stock pending completion of the payment therefor, which dividends were to be credited on the balance of the employee's subscription.

The fifth numbered paragraph provides for the charge of interest on the balance. That paragraph also provides "but in any event the interest charged shall not exceed the amount of dividend credited on your subscription during the year."

The sixth numbered paragraph provides briefly that in the event of the death of an employee before payment, the company will, at the option of the employee's personal representative, either return to his estate the entire amount, if any, credited on his subscription "without deduction for carrying charges" and cancel the contract,

or will accept complete payment from his personal representative and deliver the certificate of stock to such person.

Paragraph seven of the contract, which seems to be the one in controversy, or at least more so than any other one, reads as follows:

In the event of your departure from the employ of this company, for any cause, prior to the completion of payment of this stock, or upon your written request at any time while still in its employ, the company will pay to you the net credit, if any, accrued to you on this subscription and your subscription will thereupon be canceled with no further interest to you therein.

The eighth numbered paragraph provides that the contract is not transferable or assignable without consent of the company in writing. The final paragraph provides, " This subscription offer has been executed in duplicate on the part of the Company and your acceptance thereof in writing in the form appended will constitute this a contract between yourself and the Company, but only for the purpose and to the effect herein stated." This contract was executed by the president for the petitioner, attested by the secretary and signed by the employees. All the elements of a binding contract to sell stock, on the one hand, and to purchase, on the other, are present. There is the element of offer and acceptance required in all binding contracts. It is true that the acceptance on the part of the employee is not in the exact words of the offerer, but as we understand it, that is not necessary to create a legally binding contract. At page 128, Volume I, of Williston on Contracts, the author says, " in order to make a bargain it is necessary that the acceptor shall give in return for the offerer's promise exactly the consideration which the offerer requests. If an act is requested, the very act and no other must be given. If a promise is requested, that promise must be made absolutely and unqualifiedly. This does not mean necessarily that the precise words of the requested promise must be repeated, but by a positive and unqualified assent to the proposal the acceptor must in effect agree to make precisely the promise requested." In *Justice* v. *Lang* (New York), 1 Am. Rep. 576, cited by the petitioner, wherein the agreement between the parties was that the defendant deliver certain rifles, the plaintiff did not in terms agree to buy the rifles nor did he promise in terms to pay for them. The court said, " clear and explicit words were used to express the terms of the contract and agreement, leaving no doubt as to the subject matter thereof, the time and place for the delivery of the goods to be delivered, and the price or sum to be paid, and when such payment was to be made; and the assent of both the contracting parties also appears, that of the sellers, by subscribing their firm name at the end of the contract, and that of the buyer by the acceptance thereof. Although there is no dis-

tinct and express promise in terms by the plaintiff to pay the price specified, the terms, 'cash on delivery,' imply a promise, and create an obligation to make such payment when the rifles are delivered." In the light of the words used in the above citation it seems clear that in this case there was clearly an offer and acceptance.

Let us consider for the moment paragraph seven of this contract, which simply says, in effect, " if you wish to return your stock any time before payment of your subscription, you may do so." We can see no reason why this provision in the contract should alter its legal efficacy. The testimony of the officers of the company with respect to paragraph seven of the contract was to the effect that the company wished to give the employee every advantage, that it wished to protect him in the event of a possible decline in the market value of his stock. Indeed, we are inclined to the belief that if such a provision had not been made in this contract, it might have been inconsistent with the giving of a bonus and would have amounted to nothing more than a strict contract between the parties for the sale and purchase of stock. If the stock in question had not been protected by that provision a decline in the market value of the stock could have deprived the employee not only of the $17.50 sought to be paid to him as a bonus, but also could have deprived him of a portion or all of his purchase price.

We can not segregate paragraphs in this contract and consider them separately from all of the other provisions. The entire contract must be construed in the light of all of the terms therein and of the surrounding circumstances which tend to show the intention of the parties. In *O'Brien* v. *Miller*, 168 U. S. 287, the court said:

> The elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligation between the parties, and the intention which they have manifested in forming them.

The testimony discloses that all of the 68 contracts in question were executed in the presence of one of the officers of the company and as each employee executed his contract, the terms thereof were clearly explained to him. He was told that the company proposed to pay him additional compensation for services rendered during the year; that the sum which the company would give him would be the difference between $25 which he would pay and $42 or $43 per share; that by accepting and signing this contract the employee created an obligation to pay the sum of $25; he was told that he could take the stock up at any time he wanted to and sell it or do anything else that he wanted to with it; that he could borrow money at the bank and take it up. Furthermore, he was told the company would protect him in the event of a decline in value. The testimony was clear

that the company offered this stock to its employees without any obligation on the employee other than to pay the $25 mentioned in the contract.

Some of the employees testified that they understood that this was a contract between the company and themselves and they were obligated to pay $25 per share; that they understood that paragraph seven was designed for their protection in case of a decline in the market value; that they understood that they could take this stock up at any time they wanted to. It seems to us that the practical construction placed upon the contract by the parties should be considered rather than a theoretical construction. In *Insurance Company* v. *Dutcher*, 95 U. S. 269, 273, the court said, "The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant, than to see what they have done."

It was further said in *District of Columbia* v. *Gallagher*, 124 U. S. 505, "We think that the practical construction which the parties put upon the terms of their own contract, and according to which the work was done, must prevail over the literal meaning of the contract, according to which the defendant seeks to obtain a deduction in the contract price."

The testimony of all the parties concerned was to the effect that they understood and intended that this writing between themselves was a contract. Another important consideration is the fact that the company credited dividends to the account of each employee on the amount of stock so purchased from the date when the contract was entered into.

Taking into consideration the purpose for which this contract was designed and the intention of the parties as expressed in oral testimony and all of the surrounding circumstances, we believe that the petitioner is entitled to deduct in the fiscal year ended January 31, 1919, not only $17.50 per share for the stock paid for and taken up by the employee, but also that amount per share for the stock covered by the contracts, but not paid for.

The second allegation of error relates to the deduction from invested capital for 1920 by the respondent of the balance due from employees on the contracts as of January 31, 1919, less the payments made on those contracts during the following year prorated in accordance with the date received. We have held that the agreements between the company and the 68 employees were binding contracts. The question therefore narrows itself down to the proposition whether the accounts receivable, secured by stock held as collateral by a trustee, the fair market value of which was in excess

of the amount due, may be included in invested capital under section 326 of the Revenue Act of 1918. That section provides, "That as used in this title the term 'invested capital' for any year means (except as provided in subdivisions (b) and (c) of this section): (1) Actual cash bona fide paid in for stock or shares; (2) Actual cash value of tangible property, other than cash bona fide paid in for stock or shares at the time of such payment * * * ." Section 325 (a) of the same statute defines the term "tangible property" to mean "stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property other than intangible property." Under the facts in this proceeding there can be no question that the actual cash value of the accounts receivable is equal to their face value. We are therefore of the opinion that these accounts receivable evidenced by the contracts should be included in invested capital and that the respondent was in error in reducing invested capital by the amount of the balance due from employees on the contracts as of January 31, 1919. See *Appeal of Hewitt Rubber Co.*, 1 B. T. A. 424.

Reviewed by the Board.

> *Judgment will be entered for the petitioner on 15 days' notice, under Rule 50.*

MILLIKEN did not participate.

TRAMMELL dissents.

STERNHAGEN, dissenting: In my opinion, the decision should be for the respondent on the first point. I can not see how the purchase by a corporation of its own stock and its subsequent transfer can be an expense either paid or incurred. The only outlay by the corporation was the purchase price of some outstanding stock. This was not an expense. The resale or reissuance of the stock for less than the purchase price involved no loss, *Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803, and since it carried with it no further outlay or liability, it seems to me there was no expense to deduct. The employees bought at a cheap price, but so far as the corporation was concerned there was simply a change in the personnel of its stockholders. The corporation avoided an expense by giving the employee at an advantageous price an opportunity of sharing in future earnings or liquidation.

PHILLIPS, dissenting: Upon the basis of the decision of the Supreme Court in *American National Co.* v. *United States*, 274 U. S. 99; 47 Sup. Ct. 520; 6 Am. Fed. Tax Rep. 6747, I concur in the decision that the bonus to be paid the employees of the petitioner was a deduction in the fiscal year ended January 31, 1919.

I can not, however, agree with the result reached upon the second point involved. The agreement between the employees and the

company appears to me to be no more than an accepted subscription agreement. Certainly there was a meeting of the minds of the parties, and certainly there was a contract; but it does not follow that the employees thereby became stockholders of the corporation or that the amount of their unpaid subscriptions became accounts receivable. Nor do we know that they ever would become stockholders. For example, under parapraph 7 of the agreement, if an employee severed his relationship with the company, his only right was to recover the " net credit accrued to you on this subscription and your subscription will thereupon be canceled with no further interest to you therein." Entirely aside from the language used in designating the agreement as a subscription, how is the result consistent with the theory that the subscriber was the owner of the stock? If he was he would be entitled to pay his obligation to the company and receive his stock, for there was no agreement to resell. What is the purpose and effect of paragraph 8th if the employee owns the stock? What is the meaning of the last paragraph of the contract and especially of the words of limitation contained in the last sentence?

That dividends should be credited and interest debited on the balance due seems an equitable arrangement for the protection of both parties, but is far from establishing that the subscriber owned the stock. My opinion is that we have here only an executory contract for the purchase of stock under which the subscribers become stockholders only when the subscription price is paid. I therefore conclude that the respondent was correct when he included in invested capital only the amounts paid on these subscriptions.

MURDOCK, dissenting: I dissent on both of the points covered by the prevailing opinion. However, I concur in the dissent of Mr. Sternhagen on the first point.