AMERICAN RADIATOR & STANDARD SANITARY CORPORATION

v.

UNITED STATES.

No. 505–58.

United States Court of Claims.

Nov. 1, 1961.

---

**940**

M. Bernard Aidinoff, New York City, for plaintiff. Norris Darrell, Kendyl K. Monroe, and Sullivan & Cromwell, New York City, were on the brief.

Eugene Emerson, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. James P. Garland and Philip R. Miller, Washington, D. C., were on the brief.

JONES, Chief Judge.

The plaintiff in this action, successor by statutory merger to Mullins Manufacturing Corporation (hereinafter called "taxpayer"), which was organized under the laws of New York, sues to recover alleged overpayments of excess profits taxes for the years 1951 and 1953 paid pursuant to the requirements of the Excess Profits Tax Act of 1950, 64 Stat. 1137, 26 U.S.C.A. § 430 et seq.

The facts are stipulated. To encourage stock ownership by its supervisory em-

ployees, taxpayer gave the employees the opportunity to enter into stock purchase agreements. During July 1952, agreements, involving 70,060 shares of newly-issued common stock and 1,050 shares of treasury stock, were consummated with 290 employees for a total purchase price of $1,786,638.75.

The agreements provided substantially as follows: [1]

(1) The employee paid to taxpayer $1 in cash (the par value of the stock) multiplied by the number of shares purchased and agreed to pay the balance of the purchase price of $25⅛ per share in ten equal annual installments payable on January 15th of each year.

(2) Until the purchase price was paid, the employee was required to apply all cash dividends to the purchase price; the employee could authorize the taxpayer to make payroll deductions for application to the purchase price; the employee had the privilege at any time of paying taxpayer all, or any part, of any unpaid installment of the purchase price.

(3) As security for the unpaid balance of the purchase price, the employee pledged the purchased shares with taxpayer, but the purchaser retained all voting rights. No share could be released from the pledge until full payment of the purchase price for all of the shares purchased had been made.

(4) If any payment was not made within 30 days after due date, taxpayer could elect to declare the entire purchase price to be due and payable forthwith. Taxpayer had the further right to sell any of the shares pledged at public or private sale and apply the proceeds to the purchase price.

(5) The taxpayer had the unrestricted right to assign or pledge the agreement of sale.

(6) The employee had no right to assign or pledge the agreement, or to assign any right to receive stock thereunder, without the prior written consent of the

[1]. See Appendix A of the findings of fact for the complete agreement.

taxpayer. No share of stock purchased could be transferred or otherwise disposed of by the employee until he had paid the total purchase price due under the agreement.

(7) On the retirement or death of any employee before completing payment of the full purchase price, the employee (or his estate) had the right, within a stipulated period, to pay the taxpayer the entire unpaid balance of the purchase price.

(8) On the termination of the employment, other than by reason of death or retirement, the taxpayer had the option to repurchase from the employee all of the shares purchased by him by paying all amounts theretofore paid, or credited, on the purchase price and cancelling the employee's obligation to make further payments under the agreement.

(9) If such options were not exercised by the employee, his estate, or taxpayer, as the case may be, taxpayer would apply all amounts paid or credited on the purchase price to full payment of the purchase price of the largest number of shares which could be fully paid for by the application of such amounts, and would release such shares and pay over any remaining cash balance to the employee. Taxpayer would repurchase the remaining shares purchased by the employee under the agreement by cancelling his obligation to make further payments thereunder.

Taxpayer's accounting treatment of these transactions was to credit capital stock $1 per share and its capital surplus account $24⅛ per share. Cash was debited $1 per share (the amount paid in by the employee upon the execution of the agreement), and an account nominated "Miscellaneous Accounts Receivable— Employee Stock Purchase Plan #2" was debited $24⅛ per share.

All stock was issued to and registered in the names of the purchasing employees upon execution of the agreements during July of 1952 and it was listed on the New York Stock Exchange. A Federal issue tax was paid on the newly-issued stock. In 1952 taxpayer paid a long-term capital gain tax on the difference between cost to taxpayer of acquiring the treasury stock and the sales price of such stock as provided in the stock purchase agreements.

From July 1952 until January 30, 1956, the date of taxpayer's merger into plaintiff, taxpayer repurchased a total of 12,953 shares of stock because of death, retirement, or termination of employment.

Taxpayer in 1952 computed its excess profits credit on the "based on income" method as provided in section 435 of the Internal Revenue Code of 1939.[2] Subsection 435(a) (1) (C) provides that a factor in this computation shall be 12 per cent of the "net capital addition."

2. 26 U.S.C. (I.R.C.1939) § 435 (1952 Ed.) provides in pertinent part:

"Excess profits credit—based on income

"(a) Amount of excess profits credit. The excess profits credit for any taxable year, computed under this section, shall be—

"(1) Domestic corporations. In the case of a domestic corporation the sum of—

*     *     *     *     *

"(C) 12 per centum of the net capital addition (as defined in subsection (g) (1)) for the taxable year, minus 12 per centum of the net capital reduction * * * for the taxable year.

*     *     *     *     *

"(g) Net capital addition or reduction.

"(1) Net capital addition. The net capital addition for the taxable year shall, for the purposes of this section, be the

excess, divided by the number of days in the taxable year, of the aggregate of the daily capital addition for each day of the taxable year over the aggregate of the daily capital reduction for each day of the taxable year.

*     *     *     *     *

"(3) Daily capital addition. The daily capital addition for any day of the taxable year shall, for the purposes of this section, be the sum of the following:

"(A) The aggregate of the amounts of money and property paid in for stock, or as paid-in surplus, or as a contribution to capital, after the beginning of the taxable year and prior to such day.

"(B) The amount, if any, by which the equity capital (as defined in section 437 (c)) at the beginning of the taxable year exceeds the equity capital at the beginning of the taxpayer's first taxable year under this subchapter."

The determination of "net capital addition" requires an ascertaining of "daily capital addition" which is defined in subsections 435(g) (3) (A) and (B). In computing taxpayer's excess profits credit for 1952, the Commissioner of Internal Revenue refused to include the total amount due under the stock purchase agreements as "money and property paid in for stock, or as paid-in surplus" under subsection 435(g) (3) (A) but rather included only the actual cash paid in. Similarly, for 1953, "equity capital" [3] under subsection 435(g) (3) (B) was determined by the Commissioner to include only that amount corresponding to the figure used for "property paid in for stock" for 1952 (an average figure) and thus did not include the total amount due on the agreements.

To summarize, plaintiff contends that in determining "net capital addition" for 1952 and 1953 (and in turn the excess profits credit for those years), the total amount due and not just that actually received on the stock purchase agreements must be included. If plaintiff is correct, then taxpayer's "net capital addition" will be increased, as will its excess profits credit in proportionate amount.

By increasing the excess profits credit in 1952, taxpayer's unused excess profits credit carryback to 1951 would be increased, and this would decrease its excess profits tax liability for that year. The interest on the deficiency assessed against the taxpayer for 1951 would, in turn, be decreased. By including the total amounts due on the agreements in "equity capital" as of the beginning of the year 1953, taxpayer's excess profits credit would be increased and its ultimate 1953 excess profits tax liability decreased. This reduction would cause a decrease in the interest on the deficiency assessed for 1953. We are of the opinion that the plaintiff's contentions are essentially correct, and that plaintiff, as successor to the taxpayer, is entitled to a refund.

What constitutes "property paid in for stock, or as paid-in surplus" under § 435(g) (3) (A) and hence is to be included in the computation of "net capital addition" is not delineated in the Code. Nor has any case arising under the Excess Profits Tax Act of 1950 decided whether an agreement containing a promise to pay money on the sale of stock is includible in the computation of "net capital addition." However, the model for section 435 was a substantially identical provision in the Excess Profits Tax Act of 1940.[4] This latter provision was before the Tax Court in Difco Labs., Inc. v. Commissioner, 10 T.C. 660 (1948). There a stock purchase agreement in terms similar to the one in this action provided that a promissory note payable in 5 years with interest at 5 percent was to be given in exchange for the stock. Although issued to the employee-purchaser upon execution of the agreement and the note, the stock was retained by Difco as security for the payment of the note. If the employment were terminated, Difco had the option of repurchasing the stock; however, were this option not exercised the purchaser did have the opportunity to pay in the amount still due and thus receive the stock. It was held that the promissory note was "property paid in for stock" and, therefore, its value was to be used in determining Difco's excess profits credit for the year in which the transaction took place.

Certainly, to be considered "property" for tax purposes, the rights received by a taxpayer must be of such

3. 26 U.S.C. (I.R.C.1939) § 437(c) (1952 Ed.). "Definition of equity capital.
   "The equity capital of the taxpayer as of any time shall be the total of its assets held at such time in good faith for the purposes of the business, reduced by the total of its liabilities at such time. For such purposes, the amount attributable to each asset shall be determined by ascertaining the adjusted basis thereof (or, in the case of money, the amount thereof) and the adjusted basis shall be the adjusted basis for determining gain upon sale or exchange."

4. 26 U.S.C. (I.R.C.1939) § 713(g) (3) (1952 Ed.), repealed by Act of Nov. 8, 1945, ch. 453, title I, § 122(a), 59 Stat. 568.

vested character as to be properly considered working capital. In this respect the Government argues that there is a difference between a promissory note and an agreement containing a promise to pay. This would undoubtedly be so if the promissory notes in Difco Labs., supra, could have been negotiated to a holder in due course, in which case any defenses based on the agreement itself would be unavailable to the employee-purchaser. But, there are not sufficient facts given in Difco Labs. to determine whether the notes were negotiable. It is further argued that, in the case before this court, the taxpayer, in the event the employee terminated his employment by resignation, was limited to one of two courses set out in paragraph "8" of the stock purchase agreement (Appendix A). After such resignation the taxpayer could not sue for any balance due. Whereas in Difco Labs., if the repurchase option were not exercised by Difco, the latter could, seemingly, still sue to recover the amount remaining unpaid. We must decide if these are significant factual distinctions.

In answer to the Government's argument that the rights received by the taxpayer were not sufficiently binding and unconditional to be considered "property paid in for stock," plaintiff cites Haskell & Barker Car Co. v. Commissioner of Internal Revenue, 9 B.T.A. 1087 (1928), a case arising under an excess profits tax law of World War I. That act allowed, in computing what would be analogous to an excess profits credit, "stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property" paid in for stock. Revenue Act of 1918, § 325 (a), 40 Stat. 1091–92. The agreement in Haskell & Barker provided for full payment of the stock purchase price in 5 years; default caused the purchase right to lapse with the employer-seller return-

ing the amounts previously paid in. If the employment terminated, or at any time the employee elected, the employer would repay that amount already paid in on the agreement and cancel the obligation. The employer's rights in Haskell & Barker are no more vested than those involved in this cause of action, and the Board of Tax Appeals in that case regarded the contract as being within the provision quoted above. There is no indication that the Congress intended "property paid in for stock, or as paid-in surplus" to be less broad than the provision involved in the Haskell & Barker case.

Cases involving stock subscription agreements which hold that only amounts actually paid in, and not the total amount due, are includible in computing excess profits credit are inapposite. In a stock subscription agreement, the stock certificates are not issued to the purchaser until the full purchase price is paid. Thus, such agreements cannot be paid in *for* stock.[5] Fidelity Trust Co. v. Commissioner of Internal Revenue, 13 B.T.A. 109 (1928), clearly illustrates this. Again the question was presented of whether an agreement promising to pay money for the sale of stock was within the same provision quoted above in reference to the Haskell & Barker case. In allowing the inclusion of the total purchase price, although it had not been paid in full, the Board said at page 114:

"As these agreements were executed, the sales they called for were completed by the petitioner by the issuance of the designated number of shares of capital stock. There was then something more than a mere subscription or promise to buy which might perhaps be abrogated; there was an executed contract, in so far as the [taxpayer] was concerned, by which the obligor became the owner of shares of stock which he

---

5. The Government cites, as more in accord with its view in the action before this court, the dissent of board member Phillips in Haskell & Barker Car Co. v. Commissioner, 9 B.T.A. 1087, 1099 (1928). This dissent was clearly predicated on the fact that its author construed the agreement involved as a subscription and not a sale. As we have indicated, in the action before this court there was a sale.

hypothecated as collateral security for the balance of his obligation."

An examination of the provisions of taxpayer's stock purchase agreement and the circumstances surrounding its execution can only but yield the conclusion that the agreement was a binding contract and intended to be such by the parties. Upon default the taxpayer clearly has the power to collect any amount still due from the defaulting employee. The repurchase provisions, in the case of death or retirement, rather than detracting from the binding quality of the obligation are a sensible and worthwhile arrangement in an agreement of this type.

■ Only upon termination of employment by reason of resignation is it certain that the obligation would not be satisfied. The Government urges that this imputes an aura of contingency to the contract. It is true that if the taxpayer's use of money or property received is to a great extent contingent upon the occurrence of some event, it cannot be considered as "net capital addition." [6] Since only the rather drastic act of resignation would suffice to avoid one's duty to perform the obligation, this contingency cannot be said to be of sufficient importance to change the otherwise binding character of the agreement. The Government offers no compelling reason for differentiating between the contract and promissory note in Difco Labs. and the binding contract involved here.

■ The Government does, however, further contend that New York corporation law [7] precludes this stock from being lawfully issued prior to the full payment of the purchase price. However, this statute allows the issuance of stock if "property" is received in payment. We find no case under the New York statute which holds that a binding and secured obligation to pay, entered into in good faith, is not property which can be considered as payment for stock.[8] Since the statute on its face is in terms broad enough to include a binding contract containing a promise to pay as property, and since there are no decisions which would limit such a construction, we must conclude that the agreement before us is not prevented by the New York statute from being considered "property paid in for stock" for purposes of computing excess profits credit. Cf. Graves, Inc. v. Commissioner, 202 F.2d 286 (5th Cir., 1953), cert. denied, 346 U.S. 812, 74 S.Ct. 21, 98 L.Ed. 340 (1953).

■ We feel it necessary to emphasize that the issue has been to this point whether or not the contracts are "property paid in for stock, or as paid-in surplus." In holding that the provisions in the agreement were not of such character to prevent the obligation from being sufficiently binding to be considered property for excess profits credit purposes, we have not intended to imply that they may not be relevant in determining the *valuation* of this property. Thus, there remains the problem of ascertaining the fair market value of these agreements in order to accurately determine the amount to be included in the computation of "net capital addition." There is not sufficient evidence before this court to rule on this matter. Without intending to preclude the use of other factors, nor in any way

---

6. See Bridgeport Hydraulic Co. v. Kraemer, 219 F.2d 929 (2d Cir.1955). Graves, Inc. v. Commissioner, 16 T.C. 1566 (1951), aff'd on other grounds, 202 F. 2d 286 (5th Cir.), cert. denied, 346 U.S. 812, 74 S.Ct. 21, 98 L.Ed. 340 (1953).

7. New York Stock Corporation Law, § 69 provides in pertinent part:
"No corporation shall issue either shares of stock or bonds, except for money, labor done or property actually received for the use and lawful purposes of such corporation."

8. In In re Waterloo Organ Co., 134 F. 341, 343 (2d Cir.1904), cited by the Government in support of its argument, the court held that an unsecured note not recorded on the corporation's books as a receivable, and apparently not expected to be and in fact not paid, was not "property actually received for the use and lawful purposes of such corporation." This case came under the predecessor of section 69 of the New York Stock Corporation Law.

to indicate the weight to be given such factors, we, nevertheless, note as an example that the fair market value of a non-interest-bearing promise to pay might well be less than its face value.

Judgment will be entered for the plaintiff with the amount of recovery to be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

DURFEE, LARAMORE, and WHITAKER, Judges, concur.